J-A07039-17
J-A07040-17

2017 PA Super 175

| | | |
|---|---|---|
| In the Interest of: C.K., A Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Appeal of: Allegheny County Office of | : | |
| Children, Youth and Families | : | No. 1467 WDA 2016 |

Appeal from the Order August 30, 2016
in the Court of Common Pleas of Allegheny County
Family Court at No(s): CP-02-DP-0001320-2014

| | | |
|---|---|---|
| In the Interest of: N.L., A Minor | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Appeal of: Allegheny County Office | : | |
| of Children, Youth and Families | : | No. 1468 WDA 2016 |

Appeal from the Order August 30, 2016
in the Court of Common Pleas of Allegheny County
Family Court at No(s): CP-02-DP-0001321-2014

BEFORE:   OLSON, STABILE, and STRASSBURGER[*], JJ.

OPINION BY STRASSBURGER, J.:                    **FILED JUNE 05, 2017**

Allegheny County Office of Children, Youth and Families (CYF) appeals

from the order entered August 30, 2016, in the Court of Common Pleas of

Allegheny County, wherein the trial court determined CYF did not make

reasonable efforts to finalize the permanency plan for minor children, N.L.,

---

[*] Retired Senior Judge assigned to the Superior Court.

born in January 2009, and C.K., born in August 2011, (collectively, Children). We affirm.

K.C. (Mother) is the mother of both Children. J.K.-T (Father) is the father of C.K.[1] On September 29, 2014, the trial court adjudicated Children dependent and "highlighted Mother's experience of domestic violence and [] Children's exposure to domestic violence as primary issues to be addressed." Trial Court Opinion, 11/23/2016, at 2. Children were removed from Mother for a third time on October 29, 2014, and have remained in the same foster care placement ever since. *Id.* At the time of the order at issue, the permanency goal was "return to parent or guardian" with a concurrent goal of adoption. *Id.*; Order, 8/30/2016, at 1.

Approximately one year after Children's third removal, Dr. Rosenblum, a psychologist, conducted a series of updated evaluations concerning the family.[2] *See* Psychological Evaluation, 10/27/2015 & 10/29/2015, at 1. In Dr. Rosenblum's opinion, after undergoing counseling and experiencing a stable family life with their foster parents, Children had "made progress in dealing with extensive anxieties and emotional insecurities stemming from their past exposure to domestic violence and substance abuse difficulties on

---

[1] The parental rights of J.L., the father of N.L., have been terminated and he is not a party to this appeal. *See* Trial Court Opinion, 11/23/2016, at 2.

[2] Dr. Rosenblum had conducted previous evaluations of the family, but Mother did not show up for her appointments. *See* Psychological Evaluation, 10/27/2015 & 10/29/2015, at 1.

the part of their parents." *Id.* at 11. Nevertheless, N.L. "continue[d] to evidence concerning emotional insecurities, anxiety and a lack of confidence which stems from the trauma and instability that she experienced when living with [Mother and Father]." *Id.*

After opining that Mother had developed "very little insight" into the changes she needed to make, Dr. Rosenblum recommended that, *inter alia*, CYF refer Mother "for family therapy sessions with [Children] at a program like Three Rivers Adoption Coun[ci]l (TRAC)," stating he was "not convinced that [Mother] fully underst[ood] the impact [on Children of] being exposed to domestic violence and other sources of trauma in their family life." *Id.* He concluded that Mother needed "to be given every opportunity to succeed with her desire to reunify with [Children]" but opined that alternative permanency goals may be necessary for Children if Mother did not begin to "demonstrate significant changes with her personal functioning and lifestyle." *Id.*

After admitting Dr. Rosenblum's evaluation into the record at the next permanency hearing on November 17, 2015, the trial court ordered "CYF to explore inclusion of Mother in Children's therapy, and facilitate Mother's participation if indicated by therapist." Order, 12/20/2015, at 3. The trial court elaborated further.

> As emphasized in previous orders, resolution of the [domestic violence] issues in this matter is critical to [] Children's safety and well-being and to successful reunification. Dr. Rosenblum's

reports address the effects of exposure to domestic violence on [N.L.] in particular.

[N.L.] is participating in treatment at [Center for Traumatic Stress], and treatment there for [C.K.] is being pursued. [Children's foster father] testified that the therapist would like [Mother and Father] to participate in this therapy in some way. This should be pursued. At the moment, the Court questions Mother's understanding of the impact of [domestic violence] on [] Children….

The Court is equally concerned about Father's understanding of the [domestic violence] issues and his commitment to ensuring that they are resolved.

*Id.* at 5.

By the next permanency hearing on February 9, 2016, N.L. had completed therapy at the Center for Traumatic Stress. Order, 3/11/2016, at 4. Mother had not participated in N.L.'s therapy, but the record does not indicate whether CYF consulted with the therapist to determine if Mother's participation was advisable. N.T., 2/9/2016, at 19, 53. Therapy was pursued for C.K., but it was unclear whether Center for Traumatic Stress would accept her due to her age. *Id.* at 22-23; Order, 3/11/2016, at 4. By the time of the hearing, C.K. was working with an in-home behavioral therapist in the foster home to address an increase in concerning behaviors, and N.L. was scheduled to begin mobile therapy the following month.[3] Order, 3/11/2016, at 4.

---

[3] The foster father provided the information regarding Children's therapy. N.T., 2/9/2016, at 69, 75. The CYF caseworker did not appear to be aware
*(Footnote Continued Next Page)*

Regarding family therapy, the trial court stated "[d]espite Dr. Rosenblum's recommendation and the Court's directive that CYF explore options for Mother and [] Children to participate in family therapy, the worker did not make a referral for that until about 3 weeks prior to today's hearing." Order, 3/11/2016, at 4. The order also stated that "[t]he [trial court] believes that family therapy for Mother with [] Children is important and would be beneficial regardless of the form of permanency that is ultimately to be achieved. It may be beneficial for Father to have the opportunity to participate in family therapy as well." *Id.* at 4. Consequently, the trial court ordered "CYF to implement family therapy for Mother with Children." *Id.* at 2.

On March 22, 2016, Mother filed a motion to enforce the court order for a referral to family therapy, requesting that the trial court (1) hold CYF in contempt for failing to arrange the therapy; (2) find that CYF failed to make reasonable efforts dating back to the date of Dr. Rosenblum's evaluation; and (3) toll the timeframes under the Adoption and Safe Families Act (ASFA)[4] from the date of the evaluation until the therapy began. Motion,

_(Footnote Continued)_
of Children's participation in therapy as she testified Children were not in therapy. *Id.* at 9.

[4] ASFA is a federal law. Pennsylania adopted ASFA's mandates, including the requirement that when a child has been in foster care for 15 out of the past 22 months, trial courts must determine whether CYF has filed or sought to join a petition to terminate parental rights and if not, whether exceptions apply. *In re D.C.D.*, 105 A.3d 662, 674–75 (Pa. 2014).

3/22/2016. The trial court denied all requested relief except for ordering that "[t]he issue of the adequacy of the agency's efforts to implement family therapy is preserved for the next regularly scheduled permanency review." Order, 3/31/2016, at 1.

The following month, Mother filed another motion to enforce the court order, alleging that the therapy CYF had arranged through A Second Chance was inadequate because the therapist was not aware she was to provide trauma therapy. Motion, 4/29/2016. On May 3, 2016, the trial court granted the motion and ordered the following.

> CYF is to ensure that appropriate trauma based therapy is in place for the family to address the impact domestic violence has had on [C]hildren and to carry out the recommendations regarding family therapy made in Dr. Rosenblum's evaluation in the fall of 2015 and the [c]ourt's subsequent orders. CYF to involve Dr. Rosenblum and any other appropriate consultant to CYF in ensuring that the treating professional has an accurate understanding of the intended focus of the therapy.

Order, 5/3/2016, at 1.

On May 25, 2016, the trial court began the next permanency hearing but did not finish. Order, 5/31/2015, at 1. During the hearing, the caseworker testified that a few days after the February 9, 2016 hearing, she learned that the family-based therapy provider CYF had arranged to work with the family prior to the February hearing would not accept the case. N.T., 5/25/2016, at 26, 49. According to the caseworker, CYF then had a hard time finding a provider, but in March 2016, A Second Chance agreed to provide therapy. *Id.* at 26, 50. Due to scheduling conflicts, only one

session had occurred. *Id.* The caseworker admitted that she originally told A Second Chance that the purpose of the therapy was to address "things that are going on in the court" so Children were not "confused." *Id.* at 51. After receiving the trial court's May 3, 2016 order, the caseworker sent Dr. Rosenblum's October 2015 evaluation and dependency court orders to A Second Chance, clarifying that the purpose of the therapy was to address the effect of domestic violence on the family. *Id.* at 26, 35-36, 51. At that point, A Second Chance informed CYF that it could provide therapy but it would not be trauma-based. *Id.* at 51.

CYF also consulted with Dr. Rosenblum after the trial court ordered the agency to do so on May 3, 2016. *Id.* at 26, 36, 51. Dr. Rosenblum informed CYF he recommended TRAC to provide trauma-based services, the same agency he suggested in his October 2015 evaluation. *Id.* at 26, 36. CYF then referred the family to TRAC sometime in early May 2016. *Id.* at 26. TRAC accepted the family for services, but its next opening was not until June 2016. *Id.* at 27. A Second Chance agreed to schedule another session to keep some sort of therapy in place until TRAC began.[5] *Id.* at 52.

_____

[5] During this time, Children continued to receive individual therapy in the foster home through a "BSC" (presumably a behavioral specialist consultant), but the CYF caseworker never contacted this therapist to determine if she could fulfill the recommendations made by Dr. Rosenblum in October 2015. However, the BSC therapist later testified that she is unable to provide family therapy. N.T., 8/3/2016, at 81.

At the close of the hearing, the trial court admonished CYF for not having appropriate family therapy in place and informed CYF it should consider private therapists instead of the providers with which it normally works. *Id.* at 128. The trial court ordered the following: "CYF to ensure that family therapy is in place, as per previous orders. CYF to provide the court with a status report by May 31st, 2016 regarding implementation of family therapy." Order, 5/31/2016, at 2.

At the May 31, 2016 status-update hearing, a CYF regional office director informed the trial court CYF had consulted with Allegheny County's director for behavioral health, who opined that TRAC was the most appropriate service for the family because it was trauma-based and could continue to work with them long-term even if the permanency goal changed. N.T., 5/31/2016, at 7. The trial court agreed that TRAC "is a really appropriate service for this situation" and recommended that CYF come up with back-up options in case TRAC was not available in mid-June. *Id.* at 12-13. The regional office director responded that the county was working on an alternate plan, but TRAC seemed to be the best option. *Id.* at 13.

On August 6, 2016, after two additional continuances related to Mother's request to change counsel, the continued permanency review hearing was held. By that time, Father had attended an intake session and an initial family therapy session with TRAC. Order, 8/30/2016, at 5. Mother cancelled her individual intake session scheduled for July 5, 2016, informing

the therapist that she was dealing with "personal things," and attended the intake session later that month. *Id.* at 5-6; N.T., 8/3/2016, at 11, 17.

The TRAC therapist testified that she was not provided with Dr. Rosenblum's evaluation or dependency court orders. *Id.* at 22-23. Her understanding was that she was to address permanency-related issues and to help Mother and Father interact with Children concerning the trauma Children have experienced. *Id.* However, the only information the therapist had concerning the trauma N.L. experienced was that she had witnessed "some violent actions" and the parents could not be together. *Id.*

At the conclusion of the hearing, the trial court reviewed the history of CYF's efforts to set up family therapy, noting "it would have been reasonable for CYF to follow up on the recommendation of the expert that they consulted," but stated that despite Dr. Rosenblum's recommendation in October 2015, the trial court did not order a referral to TRAC in November 2015, because Children already had services and "duplicate therapy [would not have been] useful." *Id.* at 126-27. The trial court opined that it could have found that CYF did not make reasonable efforts at the time of the February 2016 hearing because CYF had only made a referral to family therapy three weeks prior, but declined to do so at the time because it is a "serious finding." *Id.* at 127-28. The trial court stated CYF made "some efforts … with entirely inadequate communication with the results that a therapist was put in place who didn't know what she was there for and

wasn't qualified to do it." *Id.* at 128-29. The trial court further noted that

although TRAC was finally in place, it appeared that

> the therapist at TRAC … doesn't know what she is supposed to
> be working on. … I have no reason to believe that they don't
> have the capacity to do the kind of things that is needed. But I
> don't comprehend how they will succeed if the assigned therapist
> has not been provided with the full, background information,
> which she clearly has not.

*Id.* at 129.

In its order, the trial court found "CYF did not offer an adequate

explanation for its initial failure to follow through on Dr. Rosenblum's

recommendation, for the multiple delays in pursuing services, or for the

inaccurate communication about the needed therapy, which resulted in

assignment of a provider incapable of providing the needed service and

compounded the delays that had already occurred." Order, 8/30/2016, at 5.

The trial court concluded that it did "not believe CYF's mis-steps in this

matter were intentional," but "the [c]ourt cannot and does not consider

CYF's conduct to have been reasonable." *Id.* at 5.

CYF timely filed a notice of appeal of the August 30, 2016 order. Both

CYF and the trial court complied with Pa.R.A.P. 1925. CYF raises the

following issue for our review: "Whether the trial court properly found that

[CYF] failed to make reasonable efforts to achieving the permanency goal of

reunification[?]" Appellant's Brief at 4.

Our standard of review in dependency cases is as follows.

- 10 -

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion…. [W]e accord great weight to the [trial] court's fact-finding function because the [trial] court is in the best position to observe and rule on the credibility of the parties and witnesses.

*In re W.M.*, 41 A.3d 618, 622 (Pa. Super. 2012) (citations omitted). "An abuse of discretion is not merely an error of judgment, but is, *inter alia*, a manifestly unreasonable judgment or a misapplication of law." *In re J.R.*, 875 A.2d 1111, 1114 (Pa. Super. 2005) (citing *In re N.E.*, 787 A.2d 1040, 1042 (Pa. Super. 2001).

Under the Juvenile Act, courts must conduct regular permanency hearings to review the permanency plan of the child. 42 Pa.C.S. § 6351(e)(1). At each permanency hearing, the trial court must determine, *inter alia*, "whether reasonable efforts were made to finalize the permanency plan in effect." 42 Pa.C.S. § 6351(f)(5.1).

Our Supreme Court has described the purpose behind the reasonable-efforts requirement as follows.

[T]he federal government enacted ASFA and related statutes to address the problems of foster care drift and ensure that dependent children are provided permanent homes either through reunification or adoption. To accomplish this goal, the federal government tied federal funding of foster care and adoption assistance to each state's adoption of a plan regarding its foster care system. 42 U.S.C. § 671 (setting forth the requirements of a state plan "[i]n order for a State to be eligible for payments" for foster care and adoption assistance). The

- 11 -

federal government required state plans to provide that "reasonable efforts shall be made to preserve and reunify families," absent certain exceptions. *Id.* § 671(a)(15)(B). Section 672 in turn provides, *inter alia*, that a state should "make foster care maintenance payments on behalf of each child" if "reasonable efforts of the type described in section 671(a)(15) of this title for a child have been made." *Id.* § 672(a)(1), (2)(A)(ii). The federal payments to the states are likewise based upon the Section 672 payments. *Id.* § 674; *see also* 45 C.F.R. 1356.21(b) (detailing that agencies must make reasonable efforts "to effect safe reunification" to be eligible to receive federal foster care maintenance payments).

*In re D.C.D.*, 105 A.3d at 675–76.

As the Office of Children and Families in the Courts has observed, neither federal nor Pennsylvania[6] law defines "reasonable efforts." Pennsylvania Court's Office of Child and Families in the Courts, *Pennsylvania Dependency Benchbook*, § 19.9.1, at 19-33 (2014).[7] Notwithstanding the

---

[6] Unlike this case, which focuses on the agency's efforts between two permanency hearings, Pennsylvania cases concerning reasonable efforts thus far have focused on other stages of the proceedings. *See, e.g.*, *In re S.A.D.*, 555 A.2d 123, 124–25 (Pa. Super. 1989) (initial removal); *In re R.P.*, 957 A.2d 1205, 1220 (Pa. Super. 2008) (aggravated circumstances petition); *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008) (goal change); *In re J.T.*, 817 A.2d 505, 508–09 (Pa. Super. 2003) (termination of parental rights petition). None of these cases provides a definition of reasonable efforts.

[7] Since there is no legal definition for "reasonable efforts," the Office of Children and Families in the Court directs courts to use common sense and judicial discretion, and provides the following instruction.

Black's Law Dictionary defines "reasonable" as "fit and appropriate to the end in view" while Webster's definition is "not expecting or demanding more than is possible or achievable; fairly good but not excellent; large enough but not excessive; acceptable and according to common sense or normal

*(Footnote Continued Next Page)*

lack of a legal definition, we discern the following from prior cases. Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. *In re J.R.*, 875 A.2d at 1118. "By requiring only 'reasonable efforts' to reunify a family, the statute recognizes that there are practical limitations to such efforts." *Id.* at 1118, n. 5 (citing 43 Pa.C.S. §§ 6351(e) & (f)). "It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a *reasonable* effort towards reunification." *Id.* (emphasis in original). This Court has stressed that the agency is not expected to do the impossible and is not a "guarantor of the success of the efforts to help parents assume their parental duties." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citing *In re J.W.*, 578 A.2d 952, 959 (Pa. Super. 1990)).

In the instant case, we begin our analysis with the trial court's criticism of CYF for not attempting to arrange family therapy until late January 2016. Trial Court Opinion, 11/23/2016, at 2. Our Supreme Court has "'encouraged [trial courts] to communicate clear expectations to the agency' given that a finding that reasonable efforts are lacking will have a 'significant impact' on the financial resources available to assist children and

_____
*(Footnote Continued)*

practices[."] Either of these would logically apply to the "reasonable efforts" standard found in dependency proceedings.

*Benchbook*, § 19.9.1, at 19-33.

- 13 -

their families." *In re D.C.D.*, 105 A.3d at 665 n.2 (citing the 2010 version of the *Benchbook*, currently found in §19.9.1, at 190-34 of the 2014 edition).

We observe that the trial court scolded CYF at the February 2016 hearing for not following "the [c]ourt's directive that CYF explore options for Mother and [] Children to participate in family therapy." Order, 2/9/2016, at 4. Although Dr. Rosenblum recommended that CYF arrange family therapy, the order issued after the November 2015 hearing contained no such directive. *See* Order, 12/20/2015. In fact, the trial court instructed CYF to determine whether Mother should be incorporated into Children's existing individual trauma therapy to avoid duplicating therapeutic efforts. *Id.* at 3. *See also* Order, 8/30/2016, at 5. "The order should clearly communicate to the parties, foster parents, providers, and other interested persons what is expected between the review hearings." *Benchbook*, § 12.8, at 12-23. If the trial court expected CYF to pursue family therapy in addition to incorporating Mother into Children's existing therapy, it should have explicitly ordered the agency to do so in the order issued after the November 2015 hearing. Nevertheless, the relevant period in this appeal is between the February 9, 2016 and August 3, 2016 permanency hearings, and the trial court clearly ordered CYF to set up family therapy on February 9, 2016, and again on May 3, 2016. *See* Order, 2/9/2016, at 3; Order, 5/3/2016, at 1.

While the focus of family therapy was for Mother to understand better the impact of her domestic violence experience upon Children, there is no doubt that the beneficiaries of Mother's understanding would be Children. Significantly, CYF has never argued that family therapy is unnecessary or not in the best interest of Children. *See In re J.R.*, 875 A.2d at 1118 (holding that services must directly promote the best interests of the child). Instead, the bulk of CYF's brief is dedicated to other unrelated efforts it made and the deficiencies of the parents. Similarly, Children's guardian *ad litem* (GAL) argues that Mother cancelled the first family therapy appointment due to unspecified personal reasons and did not participate in Children's individual therapy despite being court ordered to do so. GAL's Brief at 12. The GAL further contends participation in Children's individual therapy is "as consequential to Children's health, well-being, and best interests as any family therapy referral." *Id.*

The GAL may certainly be correct that Mother's participation in Children's individual therapy would have advanced their well-being, and trial courts may take failures of this nature into account when formulating the required findings of parental compliance and progress at each permanency hearing,[8] *see* 42 Pa. C.S. § 6351(f)(3), and when considering a goal change

_____

[8] The trial court failed to make findings of the progress of Mother and Father in many of the permanency review orders in this case. Determining progress toward alleviating the circumstances necessitating the original placement is often a more difficult task than determining compliance with
*(Footnote Continued Next Page)*

- 15 -

request or a petition to terminate parental rights.  ***See In re D.C.D.***, 105 A.3d at 675 (holding that even if an agency fails to make reasonable efforts towards reunification, the court may terminate parental rights if the agency otherwise proves by clear and convincing evidence the existence of grounds and that termination best serves a child's needs and welfare).  However, barring a judicial finding that a service would be futile because a parent refuses to attend or is incapable of benefiting from the service, shortcomings of the parents do not excuse the agency from making reasonable efforts at this stage of the proceedings.

While parents have an "affirmative duty" to show "a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities," the "agency must, of course, put forth a good faith effort in making services available to the parent…."  ***In re J.J.***, 515 A.2d 883, 890 (Pa. 1986).  ***See also In re Diaz***, 669 A.2d 372, 377 (Pa. Super. 1995) (stating that agencies have a duty to assist parents and parents have a "corresponding duty to use best efforts to overcome obstacles to perform parental duties").  Thus, although the agency cannot guarantee the parents' success, it is clear that the agency's duty to

*(Footnote Continued)* ————————

the permanency plan, but we remind the trial court that it is a finding required by the Juvenile Act, even if a caveat needs to be made noting the impact of external issues such as CYF's lack of efforts.  ***See*** 42 Pa. C.S. § 6351(f)(3).

make reasonable efforts to finalize the permanency plan is independent of the parents' duty to accept such efforts.

The argument advanced by CYF and the GAL that the trial court never ordered CYF to use TRAC specifically is somewhat more persuasive. *See* CYF Brief at 17 (contending that without a court order, CYF is required to allow all contracted providers to bid on a referral);[9] GAL Brief at 11 (noting "the permanency review orders never reflected that TRAC would be the only organization acceptable to accomplish the goal of family therapy or that alternatives would not satisfy the [t]rial [c]ourt's expectation"); *id.* at 10-11 (citing N.T., 2/9/2016, at 101) (emphasis removed) (arguing that the trial court explicitly condoned use of a different provider than TRAC when the trial court stated that a family-based provider was "an appropriate service to do the kind of thing [the trial court] had in mind"). However, this argument ultimately fails as well.

Timeframes in the Juvenile Act indicate that a component of reasonable efforts is diligence by the agency. The law prioritizes reunification initially, but if reunification is not viable "after reasonable efforts have been made to reestablish the biological relationship," child welfare agencies must "work toward termination of parental rights, placing the child with adoptive parents," ideally within 18 months. *In re B.L.L.*,

---

[9] CYF does not specify whether this requirement stems from an internal policy, a regulation, or some other source.

787 A.2d 1007, 1016 (Pa. Super. 2001). "While this 18–month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re R.M.G.*, 997 A.2d 339, 349 (Pa. Super. 2010) (citations omitted). As our Supreme Court has recognized, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013).

Assisting parents with achieving the Juvenile Act's goal of family unity in a timely fashion ultimately benefits children, as it will result either in a successful safe reunification or a clearer picture of the parents' inability to remedy the conditions causing the child to be out of their care, requiring movement towards an alternate permanency goal. Eighteen months is a very long period out of a child's short life, and there is no doubt that 18 months of prolonged uncertainty is a burden borne most by the child. But 18 months may seem quite short to a parent who has to overcome significant obstacles to regain custody. Thus, it is imperative that the agency not serve as an additional roadblock to parents' progress. This is particularly the case because parental rights may be terminated even if the agency fails to make reasonable efforts to reunify the family. *See In re D.C.D.*, 105 A.3d at 675.

We acknowledge that some delays are unavoidable and outside of the control of child welfare agencies. Here, however, part of the cause for delay was CYF's failure to communicate accurately the purpose of the service to its contracted provider in March 2016. CYF was free to use any provider capable of performing the service, but "CYF incorrectly advised A Second Chance that the purpose of the therapy was to address [the] communication [of Mother and Father] with [] Children about court," resulting in the arrangement of therapy not tailored to the family's needs and several more months' delay. Trial Court Opinion, 11/23/2016, at 2 n.10. CYF offered no explanation as to why it took two motions by Mother to get the agency to consult with mental health professionals to determine the most appropriate provider. Then, even after TRAC began to work with the family, "the therapist's testimony revealed that she had not received full background information on the matter, so it remained unclear whether she was equipped to focus on the issues that Dr. Rosenblum and the [trial court] identified so long ago." *Id.* at 3.

This Court has previously recognized that

> [w]hen the child welfare agency uses the services of other public agencies to meet its responsibility for making reasonable efforts, it should not simply refer families to other agencies and assume that the obligation has been met. Unless responsibility for a child's or family's case has clearly been delegated to the other agency and a mechanism for accountability has been established, the referring child welfare agency should retain responsibility for the case and for ensuring that the family receives the **appropriate** services.

*In re S.A.D.*, 555 A.2d at 128 (citing *Making Reasonable Efforts: Steps for Keeping Families Together*, National Council of Juvenile and Family Court Judges, the Child Welfare League of America, the Youth Law Center and the National Center for Youth Law (no publication date)) (emphasis added). We are aware of the pressures and large workload placed upon child welfare agency caseworkers, many of whom work very hard to serve their assigned families. Nevertheless, it is crucial that child welfare agencies monitor their cases and follow up diligently to ensure that services are implemented in accordance with the families' needs and court orders. Simply making the referral is not enough.

Finally, we note that the trial court is in the best position in these situations to listen to the agency's explanations and determine their credibility. *See In re W.M.*, 41 A.3d at 622. Having heard from CYF, the trial court concluded that CYF did not offer adequate explanations for the delays or miscommunications. Order, 8/30/2016, at 5. After reviewing the record, we cannot determine that this conclusion was manifestly unreasonable. *See In re J.R.*, 875 A.2d at 1114.

Based on the foregoing, we hold the trial court did not abuse its discretion in determining that CYF failed to make reasonable efforts to finalize the permanency plan during the relevant review period. We therefore affirm the trial court's August 30, 2016 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/5/2017