J-S11001-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: D.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.H. AND E.H., PARENTS | |
| | No. 3125 EDA 2018 |

Appeal from the Order Entered September 19, 2018
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s): CP-45-DP-0000055-2016

BEFORE: SHOGAN, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED APRIL 29, 2019**

Appellants, T.H. ("Mother") and E.H. ("Father") (collectively "Parents"), appeal from the permanency review order that continued the dependency and foster care placement of their daughter, D.H. ("Child"), born in October of 2005. The order further denied Parents' request that Child be returned to their care and that her primary permanency goal be changed from subsidized permanent legal custodianship ("SPLC") back to reunification. After careful review, we affirm.

The trial court fully set forth the facts of this case in its Pa.R.A.P. 1925(a) opinion, but we summarize some of the relevant factual and procedural history as follows. Trial Court Opinion, 12/18/18, at 1-10. Child was diagnosed with oppositional defiant disorder ("ODD") and attention-deficit/hyperactivity disorder ("ADHD"), for which she was prescribed several medications and for

which she has an individualized education program ("IEP") at her school.  N.T., 6/29/18, at 8-9.

In 2016, Parents and Child lived with Paternal Grandmother in her home.  *Id.* at 10.  In April that same year, Child, who had been prescribed melatonin for sleep issues, ran out of medication.  Mother went to a pharmacy and, after consultation with a clerk about non-prescription medication, purchased Benadryl.  Trial Court Opinion, 12/18/18, at 1.  Although Child was under twelve years old, Mother administered a dosage intended for a twelve-year-old.  *Id.*  As a result, Child became unconscious.  *Id.*  Mother attempted to wake Child by slapping her, resulting in bruising over her right eye and on her thigh.  *Id.*  When Child did not wake, Mother placed her in a cold shower and alerted Father and Paternal Grandmother.  *Id.*  Rather than calling 911 or taking Child to the nearest hospital, the family drove Child to a regional hospital further away.  *Id.*  At the hospital, Child's body temperature was measured at 94 degrees Fahrenheit.  *Id.*  A criminal investigation was commenced, but no charges were filed as a result.  *Id.*  Nevertheless, a Child Protective Services ("CPS") investigation concluded with Mother's indication for causing injury to Child.  *Id.*

After a shelter care hearing on April 19, 2016, Child was removed from Parents' custody and placed in foster care.  Child was adjudicated dependent on April 25, 2016, with an initial permanency goal of reunification.  Permanency review hearings were held in July of 2016, October of 2016,

January of 2017, April of 2017, July of 2017, October of 2017, January of 2018, June of 2018, and August of 2018. The October 2017 permanency order first established a primary permanent placement goal as SPLC, although a concurrent goal remained reunification.[1]

Parents originally participated in programming through Justice Works from July of 2016 through February of 2017. N.T., 6/29/18, at 47-48. The programming consisted of nurturing parenting, case management, and visit coaching. *Id.* Services were closed out in February of 2017 because Parents had not made significant progress, and Child was not safe in the home at that time. *Id.* at 67-68, 70.

Regarding Parents' compliance, they have worked to address their employment issues, attended therapy and received counseling, and attended parenting classes. N.T., 6/29/18, at 44-45. Although there are no real safety issues with the home itself, the Monroe County Office of Children and Family Services ("CYS") continued to have safety concerns regarding Parents' interactions and behaviors. *Id.* at 9-10.

Child is anxious around Parents to the point that she picks her skin, causing open wounds. *Id.* at 31, at 37, 41-42; N.T., 8/22/18, at 43-47, 55-56. Child expressed anxiety to her caseworker about being alone with Parents. N.T., 6/29/18, at 40. Child's foster mother reported that after visits

_____

[1] Parents did not appeal the goal change at that time.

and telephone calls from Parents, Child has a spike in negative behavior, and that she will sometimes refuse to answer the telephone if Parents call. *Id.* at 43.

On March 8, 2018, Parents filed a petition seeking to terminate Child's care plan, return Child to Parents' care, or alternatively, to hold a hearing to determine whether the permanency goal should be changed. Petition, 3/8/18, at 1. Parents argued that they complied with the family service plans and that they were being deprived of their rights under Pennsylvania law. *Id.* at 2. Permanency review hearings concerning the petition were held on June 29, 2018, and August 22, 2018.[2]

Parents and Child's guardian *ad litem* submitted briefs for the court's consideration. On September 18, 2018, the court entered the permanency review order that is the subject of the instant appeal. The court found that Child's placement continued to be necessary and appropriate; Parents had made moderate compliance with their permanency plan and towards alleviating the circumstances necessitating the original placement; CYS had made reasonable efforts to finalize Child's permanency plan; reasonable efforts were made to comply with the family finding requirements of Pa.R.J.C.P. 1149; placement in the home was contrary to the welfare of Child;

_____

[2] Anthony Quaranta, Amy Carr, Nancy Wenzel, and Marcia Coronata testified for CYS. Child testified *in camera*. Parents called Ana Velez, Cherrell Gaynor, and Paternal Grandmother to the stand and testified on their own behalf.

Child's placement was the least restrictive placement meeting the needs of Child; and Child's placement goal should continue as placement with a legal custodian, with a concurrent goal of return to parent or guardian. Order, 9/18/18, at 1-3.

Parents timely appealed on October 17, 2018. Initially, they failed to contemporaneously file their statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court issued an order on October 18, 2018, allowing Parents ten days from the date of entry of the order to file their statement. Parents complied and filed their statement of errors that same day.[3] The trial court filed its Pa.R.A.P. 1925(a) opinion on December 18, 2018.

On appeal, Parents raise the following issues for our review:

A. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record when it found that the parents' compliance with the family services plan was "moderate"?

B. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record when it found that "[CYS] meets with the Parents and counselors together to discuss concerns"?

_____

[3] While the initial notice of appeal was defective, we need not dismiss the instant appeal because Parents later filed their statement, there was no allegation of prejudice from the late filing, and appellate review was not impeded. *In re K.T.E.L.*, 983 A.2d 745, 748 (Pa. Super. 2009); *Cf. J.P. v. S.P.*, 991 A.2d 904 (Pa. Super. 2010) (finding that the appellant waived issues for appeal by failing to comply with the trial court's order directing her to file a Rule 1925(b) Statement within twenty-one days); *cf. J.M.R. v. J.M.* 1 A.3d 902 (Pa. Super. 2010) (finding the same, except as to an order of this Court).

C. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record when it found that "[t]here has been moderate progress toward alleviating the circumstance which necessitated the original placement"?

D. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record when it found that "[CYS] has satisfied the requirements of [Pa.R.J.C.P. 1149] regarding [f]amily [f]inding"?

E. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record when it found that visitation with [P]arents is adequate in that they have one supervised visit weekly in the community?

F. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record by finding that [C]hild remains dependent?

G. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record when it failed to provide an opinion fully addressing and evaluating the body of evidence submitted by Parents or relevant statutes, codes or legal precedent?

H. Did the [c]ourt commit error at law or abuse its discretion by making a finding not supported by the record or law when it found that the "placement is the least restrictive placement that meets the needs of the child and there is no less restrictive alternative available, in that the child's needs are being met[,"] where there is another capable custodial parent (and Grandparent) available and there was no family fact finding or family group decision meeting held?

Parents' Brief at 2-4.

With regard to dependency cases:

[t]he standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear

before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re N.A.*, 116 A.3d 1144, 1148 (Pa. Super. 2015). Thus, we employ an abuse of discretion standard. *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).

We have further noted:

[w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

When the court removes a child from his or her home, our Rules of Juvenile Court Procedure provide that the court must determine whether "the child's placement is the least restrictive placement that meets the needs of the child, supported by reasons why there are no less restrictive alternatives available[.]" Pa.R.J.C.P. 1242(C)(3)(c); *see also* Pa.R.J.C.P. 1514(A)(2).

During a child's dependency:

[t]he standard against which visitation is measured . . . depends upon the goal mandated in the family service plan. Where . . . reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If . . . the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children.

*In re C.B.*, 861 A.2d 287, 293 (Pa. Super. 2004) (quoting *In re B.G.*, 774 A.2d 757, 760 (Pa. Super. 2001)).

Regarding the disposition of dependent children, the Juvenile Act ("the Act"), 42 Pa.C.S. §§ 6351(e)-(g), provides the criteria for a permanency plan and the review thereof. The Act provides that permanency review hearings should be conducted within six months of removal from the parents' care, and within six months of each prior permanency hearing until the child is returned to her parents or removed from the jurisdiction of the court. 42 Pa.C.S. § 6351(e)(3)(i). The purpose of these hearings is to review the permanency plan of the child, determine the date by which the goal of permanency might be achieved, and consider whether placement continues to be best suited to the safety, protection, and physical, moral, and mental welfare of the child. 42 Pa.C.S. § 6351(e)(1). At the conclusion of the permanency review hearings, the court must issue an order determining a disposition best suited to the safety and protection, as well as the physical, mental, and moral welfare of the child. 42 Pa.C.S. § 6351(g).

The Act provides, in relevant part, that the trial court should determine the following at each permanency hearing:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

- 8 -

(4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

* * *

(12) If the child has been placed with a caregiver, whether the child is being provided with regular, ongoing opportunities to participate in age-appropriate or developmentally appropriate activities. In order to make the determination under this paragraph, the county agency shall document the steps it has taken to ensure that:

(i) the caregiver is following the reasonable and prudent parent standard; and

(ii) the child has regular, ongoing opportunities to engage in age-appropriate or developmentally appropriate activities. The county agency shall consult with the child regarding opportunities to engage in such activities ... .

42 Pa.C.S. § 6351(f). Based upon the analysis made under Subsection (f), the trial court should determine the appropriate placement for the child. 42 Pa.C.S. § 6351(f)(.1). A trial court is not required to itemize its findings as long as it considers the various factors of Section 6351(f), concludes that reunification is not the appropriate placement goal, and provides reasons for its conclusion that are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). During permanency reviews, the statute mandates a focus on the child's best interests, and the safety, permanency, and well-being of the child take precedence over all other considerations. *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008); *In Interest of: T.J.J.M.*, 190 A.3d 618, 623-624 (Pa. Super. 2018).

With regard to the definition of "reasonable efforts,"

[b]ecause the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. *In re J.R.*, 875 A.2d [1111, 1118 (Pa. Super. 2005]. "By requiring only 'reasonable efforts' to reunify a family, the statute recognizes that there are practical limitations to such efforts." *Id.* at 1118, n. 5 (citing 43 Pa.C.S. §§ 6351(e) & (f)). "It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a *reasonable* effort towards reunification." *Id.* (emphasis in original). This Court has stressed that the agency is not expected to do the impossible and is not a "guarantor of the success of the efforts to

- 10 -

help parents assume their parental duties." ***In re A.L.D.***, 797 A.2d 326, 340 (Pa. Super. 2002) (*citing **In re J.W.***, [578 A.2d 952, 959 (Pa. Super. 1990)]).

***In Interest of C.K.***, 165 A.3d 935, 942 (Pa. Super. 2017). The first eighteen months of a child's placement is crucial for establishing services. ***Id.*** at 944.

Additionally, during dependency cases, the Rules of Juvenile Court Procedure require that the trial court engage in family finding, in relevant part, in the following manner:

**A. Court's inquiry and determination.**

(1) The court shall inquire as to the efforts made by the county agency to comply with the family finding requirements pursuant to 62 P.S. § 1301 *et seq*.

(2) The court shall place its determinations on the record as to whether the county agency has reasonably engaged in family finding.

Pa.R.J.C.P. 1149. The official comment to the rule further explains that

efforts by the county agency **may include**, but are not limited to whether the county agency is or will be: a) searching for and locating adult relatives and kin; b) identifying and building positive connections between the child and the child's relatives and kin; c) when appropriate: i) supporting the engagement of relatives and kin in social service planning and delivery of services; and ii) creating a network of extended family support to assist in remedying the concerns that led to the child becoming involved with the county agency; d) when possible, maintaining family connections; and e) when in the best interests of the child and when possible, keeping siblings together in care.

The extent to which the county agency is involved in the case when a child is still in the home is dependent on several variables and specific to each case. In some instances, the county agency is more involved and actively engaged in family finding because the child needs support services or could be removed from the home. The search in these instances is used to find resources to

help keep the child in the home by preventing removal, or to find resources if removal becomes necessary.

*Id.*, cmt. (emphasis added).

With a goal change petition, the trial court

considers the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In Interest of A.N.P.*, 155 A.3d 55, 67 (Pa. Super. 2017) (quoting *In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007)).

Here, Parents raise eight issues challenging the trial court's permanency-review order and the determinations made therein. Parents' Brief at 2-4. Essentially, they argue that continued dependency and a permanency goal of SPLC is not warranted where Parents were making progress in addressing the issues that led to Child's dependency, that CYS did not make reasonable efforts at reunification, and that placement was not the least restrictive alternative available. *Id.* at 30-59. Many of these arguments repeat and rephrase previous issues. Further, we note that many of Parents' arguments contain no citation to any legal authority, and accordingly risk waiver. *S.M.C. v. W.P.C.*, 44 A.3d 1181, 1189 (Pa. Super. 2012); Pa.R.A.P. 2119(a). However, we decline to find waiver in this instance. Nevertheless, Parents' claims do not merit relief.

- 12 -

We address Parents' first, third, and sixth issues together for ease of analysis. Parents contend that the court abused its discretion in finding that Child remained dependent. Parents' Brief at 46. Parents claim that they are in substantial, not moderate, compliance with their family services plan; that the circumstances leading to the original placement were alleviated; that CYS did nothing to further the concurrent goal of reunification; and that even if their compliance was only "moderate," compliance is not the sole factor the court must consider. *Id.* at 30-34, 36-43, 46-53.[4] Essentially, Parents disagree with the trial court's interpretation of the evidence of record and the credibility determinations made regarding Parents' testimony. *Id.* at 52.

The trial court addressed its finding of dependency and the placement goal in the following manner:

> In this case, we continued [Child's] dependency and foster placement and retained the current placement goal because the evidence convinced us that doing so was in her best interests. In summary, as of the date the most recent review hearing concluded, [Child] had continuously been dependent and in care for 28 months. During the first 18 months, despite the services provided by CYS and Justice Works, Parents made little progress. As a result, the goal was changed to SPLC in October of 2017. Over the next 10 months or so, Parents have made some progress. However, their progress has not been enough for them to demonstrate, even at a visit, that they are currently ready to parent [Child] properly and safely. In this regard, Parents still

---

[4] Parents raise additional arguments, namely, that their due process rights were violated and that they were not given a fair hearing. However, because Parents fail to cite any legal authority in support of this position, or further elaborate upon the alleged due process violations, they have waived the arguments for purpose of appeal. *S.M.C.*, 44 A.3d at 1189; Pa.R.A.P. 2119(a).

fight at visits, are not yet on the same page regarding co-parenting, and are still developing their parenting and coping skills. Despite their testimony and belief to the contrary, Parents have not been able to transfer what they have learned, or what they are learning, to visits or other settings outside of their counseling sessions.

Very significantly, given the history of this case and the conduct of Parents during visits, anticipation of upcoming visits causes [Child] anxiety to the point that she picks at her skin, [Child] has concerns about being alone with Parents, there is a spike in [Child's] negative behaviors after both visits and phone calls, and that [Child] sometimes does not want to answer the phone when she sees that it is Parents who are calling.

Additionally, Parents have not progressed to the point where they are self-sufficient, generally or in their ability to parent [Child]. Parents currently rely on Paternal Grandmother for housing, for guidance, and, apparently, at least in part for financial support. There is no question that Paternal Grandmother is the support that Parents would need to parent [Child], at least at any time in the foreseeable future. Nonetheless, Parents still argue with Paternal Grandmother during or resent her presence at visits and at times recoil against her parenting advice.

During the two and one-third years that [Child] has been dependent, foster families, not Parents, have cared for her. While [Child]'s behaviors at first necessitated two or three placement changes, she has now been in her current foster home for more than 18 months with a family in whose care she has made great strides, that cares for her, and who want to be a permanent resource for her. In this regard, although [Child] still has behavioral issues and emotional and educational needs, while in her current foster placement her behaviors have "subsided tremendously" and she is being transitioned out of a partial hospitalization program into a less restrictive special education classroom in her home school. [Child] still loves her parents and wants to continue to see and have a relationship with them, but has also expressed that she would like to be adopted by her foster family and, in any event, realizes that she will need to remain in her foster home.[5]

[5] According to Parents and their attorney, [Child] has also stated that she wants to go home to Parents. It

is interesting that Parents and their attorney point this out since counsel argued at [the] hearing that [Child] was not competent to testify and even took the position that the [c]ourt should not speak with her. Not surprisingly, when we spoke with [Child] she had trouble staying focused or on point. For clarification, we did not base our finding that interaction and anticipated interaction with Parents causes [Child] anxiety and increases negative behaviors on our in camera discussion with [Child]. Rather, we based those findings on the evidence presented by others, including the testimony of the CYS caseworker, the CYS visit supervisor, and [Child's] therapist, reports from the foster parents, and the observations and arguments of the GAL.

Simply put, on paper, Parents have checked off most of the boxes regarding their service plan goals. However, Parents' recent compliance has not been accompanied by progress which, when viewed in context of the history of this case, objectively demonstrates their ability to properly and safely parent [Child], to ensure her mental, physical, and emotional well-being, and to promote her best interests. Moreover, while most boxes have been checked, interaction with Parents still causes [Child] anxiety. In contrast, [Child] is doing well in her foster home where she is improving behaviorally and her safety, well-being, and everyday needs are being met.

\* \* \*

As noted, Parents and their attorney spent significant time attempting to relitigate and downplay the initial overdose incident. However, the time for doing so is long past. The incident occurred and [Child] was adjudicated dependent in April of 2016. Any challenge to the initial dependency determination should have been made long ago.

Trial Court Opinion, 12/18/18, at 13-16.

Here, while the trial court did indeed find Parents in only moderate compliance with the permanency plan, this finding was not the sole reason Child's dependency was continued and Parents' request for a placement

change denied. Although the trial court did not itemize its findings, it examined the relevant, mandated statutory factors in depth, including the continuing necessity for and appropriateness of placement, the extended length of time Child had been in care, and the extent of progress Parents made towards alleviating the circumstances that led to the placement – namely, Parents' poor judgment regarding medical and parenting decisions of Child. *R.J.T.*, 9 A.3d at 1190; 42 Pa.C.S. § 6351(f). Additionally, Parents' goals were to obtain stable employment and housing, but Parents have been unable to achieve this goal without the assistance of Paternal Grandmother.

Although Parents argue that the trial court's findings are not supported by the record and that the court did not make specific credibility determinations, a thorough examination of the notes of testimony provides otherwise. Essentially, Parents disagree with the fact that the trial court credited the testimony of caseworkers rather than the testimony of Parents, particularly with regard to certain contested issues such as the cause of Child's anxious habit of picking her skin. This, however, is a credibility determination, and where the trial court's findings are supported by the record, we will not disturb them on appeal. *N.A.*, 116 A.3d at 1148. Accordingly, we discern no error or abuse of discretion in the trial court's thorough analysis and conclusions regarding dependency and placement goals.

Parents' second issue challenges the court's findings that CYS had made reasonable efforts to finalize the permanency plan. Parents' Brief at 24. In

so arguing, Parents contend that the court erred in determining that "the Agency meets with the Parents and counselors together to discuss concerns" because there was minimal record evidence to support this conclusion. *Id.* at 34. Parents argue that they were not informed of medical, dental, and school appointments related to their daughter, and that CYS caseworkers did not meet with their counselors. *Id.* at 35.

However, as noted above, CYS is not expected to "do the impossible" as long as the services provided are reasonable efforts and such services are provided within an appropriate period. *C.K.*, 165 A.3d at 942. Here, CYS did indeed provide services promptly to assist Parents, including supervised visitation, caseworker services, visit coaching, case management services, and parenting classes. Trial Court Opinion, 12/18/18, at 4. The trial court noted that in the first fifteen to eighteen months of Child's placement – a critical time after which a termination petition may be filed – Parents had made little substantive progress to the point that services were discontinued. *Id*. Parents have provided no definition of "reasonable efforts" or case law to suggest that the services provided to them did not rise to the level of reasonable efforts. At this juncture, reunification is no longer the primary goal. Accordingly, the trial court did not commit an error of law or abuse of discretion in finding that CYS made reasonable efforts towards reunification. *N.A.*, 116 A.3d at 1148; *L.Z.*, 111 A.3d at 1174.

In their fourth issue, Parents argue that CYS did not satisfy the requirements of Pa.R.J.C.P. regarding family finding. Parents' Brief at 43. Parents assert that there was evidence that Child's relatives were present in the courtroom and were willing to serve as a placement resource, but they had never been contacted for a meeting with CYS, nor was any evidence presented that CYS had engaged in family finding as mandated by "best practices" under law. *Id.* at 43-44.[5] Essentially, Parents contend that the trial court's determination that CYS had engaged in family finding was contradicted by the record and testimony. *Id.* at 44.

As noted above, the Rules of Juvenile Court Procedure require that the court engage in family finding, including inquiry into the efforts made by the county agency to comply with the family finding requirements pursuant to 62 P.S. § 1301 *et seq.* Pa.R.J.C.P. 1149. These efforts may include, but are not limited to, searching for and locating adult relatives and kin, identifying and building positive connections among the child, child's relatives, and kin, and

_____

[5] Parents point to their letters to CYS sent in July of 2018 and August of 2018, requesting family group decision-making meetings, as proof that CYS did not engage in family finding. Parents' Brief at 44. The July 27, 2018, and August 7, 2018, letters addressed to CYS are included in Parents' reproduced record, but they do not appear in the certified record. Although the letters were admitted as R-26 and R-27 into evidence, the responsibility rests upon Parents to ensure that the record certified on appeal is complete. *In re G.T*., 897 A.2d 1197, 1198 (Pa. Super. 2006). Here, it appears that none of the exhibits entered into evidence during the hearings were included in the certified record.

- 18 -

when appropriate, supporting the engagement of relatives and kin in social service planning. *Id.*, cmt.

The record reflects the court found that CYS satisfied the requirements of Pa.R.J.C.P. 1149 regarding family finding in orders dated July 7, 2016; October 13, 2016; January 12, 2017; April 6, 2017; July 13, 2017; October 12, 2017; January 4, 2018; June 29, 2018; and September 18, 2018. In each of these orders, the court directed CYS to continue to engage in family finding until ordered otherwise. There is no evidence that CYS did not comply with these orders.

The first indication in the record that Parents challenged this contention was in their proposed permanency review order, filed with the court September 7, 2018. In that proposed order, Parents averred that there were "two" relatives that could have served as potential resources, but did not name said relatives, nor did they elaborate upon CYS' failure to contact them, or cite to any relevant statutory authority or law in their memorandum of law. Memorandum of Law, 9/7/18, at 1-25; Proposed Order, 9/7/18, at 1-2. At the hearings, Parents' counsel did not raise the issue of family finding, either as placement resources or as a potential family group, and counsel asked Parents no questions regarding potential family members, either as placement resources or as members of a desired family group. On cross-examination, when questioned regarding additional "family group members," Father responded, "Possibly my brother . . . he lives in Nazareth or has a Nazareth

- 19 -

address. I'm not sure exactly what county." N.T., 8/22/18, at 137-138. Additionally, on cross-examination, Mother stated that an additional family member she would want present at family group as "my Aunt [B.]" *Id.* at 156. Mother added, "There's not a whole lot of family members that I consider blood family members but we do have family friends that we consider blood . . . ." *Id.*

Parents raise the issue specifically, and for the first time, in their Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Concise Statement of Errors Complained of on Appeal, 10/18/18, at ¶ 4. Based on the above, we conclude that Parents failed to properly raise this issue before the trial court, and have accordingly waived it for purposes of appeal. *See* Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

In their fifth issue, Parents argue that the trial court committed an error of law and abuse of discretion when it found that once-weekly supervised visitation was adequate. Parents' Brief at 45. Parents argue that because the reason for Child's placement has been eliminated, there is no reason Child cannot return to Parents' home for weekly visits. *Id.* Parents contend that this treatment does not allow them to show "they can put what they have learned in parenting class into practice." *Id.* at 45-46.

Here, while Child's goal remained reunification, visitation was provided. In July of 2016, Parents had once-weekly supervised visitation with Child.

Permanency Review Order, 7/7/16, at 2. In October of 2016, Parents had supervised visitation with Child in the community. Permanency Review Order, 10/13/16, at 2. In January of 2017, Parents had once-weekly visitation with Child in their home. Permanency Review Order, 1/12/17, at 2. In April of 2017, Parents had once-weekly supervised visitation, location unspecified. Permanency Review Order, 4/6/17, at 2. In July of 2017, Parents had twice-weekly supervised visits in the community. Permanency Review Order, 7/13/17, at 2-3. At no time during the pendency of this case is there any indication of record that Parents objected to or filed a request for a change in visitation.

As noted *supra*, if the goal is no longer reunification, then visitation may be limited or denied if it is in the best interests of Child. **C.B.**, 861 A.2d at 293. In October of 2017, Child's goal was changed from reunification to placement with a legal custodian. Permanency Review Order, 10/12/17, at 1-2. At that time, Parents' visitation remained twice-weekly supervised visits in the community. **Id.** Insofar as orders following the goal change show, visitation remained twice-weekly supervised visits in the community and at a minimum once per week. Permanency Review Order, 1/4/18, at 1-2; Permanency Review Order, 6/29/18, at 1-2; Permanency Review Order, 9/18/18. Here, visitation was not substantially altered from what it had been during the pendency of the case. Further, it was in the best interest of Child for visitation to be limited to supervised and outside of the home, as evidence

was presented that showed that visits caused Child anxiety, to the point that she would pick at her skin and occasionally refuse to answer telephone calls from Parents. *C.B.*, 861 A.2d at 293. Accordingly, the trial court did not commit an error of law or abuse its discretion in setting visitation as "supervised visitation with [Child] at a minimum once per week in the community." Permanency Review Order, 6/29/18, at 1-2; Permanency Review Order 9/18/18, at 1-2; *N.A.*, 116 A.3d at 1148; *L.Z.*, 111 A.3d at 1174.

In Parents' seventh issue, they argue that the court erred and abused its discretion by failing to provide an opinion fully addressing and evaluating "the body of evidence" submitted by Parents or relevant statutes. Parents' Brief at 53. They contend that they were deprived of due process and did not receive a fair hearing. *Id.* at 53-54. Parents argue that they were not adequately notified of what they must do to satisfy CYS, pointing to the trial court's observation that Parents had not completed psychological evaluations as proof of a due process violation. *Id.* at 56. Initially, we note that Parents have, again, failed to cite any case law discussing due process claims. Accordingly, they have risked waiver of this argument. *S.M.C.*, 44 A.3d at 1189; Pa.R.A.P. 2119(a). Regardless, this issue is without merit.

As noted above, in dependency cases, after permanency review hearings the court must issue orders continuing, modifying, or terminating placement or other disposition best suited to the safety, protection and

physical, mental and moral welfare of the child. 42 Pa.C.S. § 6351(g). The statute also provides the findings of fact necessary for such orders. 42 Pa.C.S. § 6351 (e), (f), (f.1). In the instant case, the trial court's permanency review order comports with the statute. A permanency review order is not the avenue through which Parents may obtain an extensive discussion of the evidence, relevant case law and statutory authority, or claims of error. To this end, the Pa.R.A.P. 1925(a) opinion on appeal is the appropriate avenue for more through discussions of the court's order and the reasoning behind it. A thorough Pa.R.A.P. 1925(a) opinion was issued in this case that discussed and weighed the evidence, made credibility determinations, and set forth the appropriate case law. Parents, of course, disagree with the court's findings and credibility determinations. As the trial court notes, "it is clear that Parents take issue with [the court's] findings and conclusions because [it] did not view the evidence in the manner they advocated and [the trial court's] findings do not agree with their proposed findings. This does not allege, much less establish, error." Trial Court Opinion, 12/18/18, at 18.

As discussed above, we do not discern an error of law or abuse of discretion in the trial court's conclusion that continued dependency and a permanency goal of SPLC best suited Child's interests. *N.A.*, 116 A.3d at 1148; *L.Z.*, 111 A.3d at 1174.

Finally, Parents argue that the trial court committed an error of law or abused its discretion by finding that SPLC is the least restrictive placement

available to Child. Parents' Brief at 58. Parents argue that because Mother offered to move out of the house for six months, Child should be allowed to return to the home. *Id.* Parents argue that CYS did not prove that Child remained dependent from March 2018 through August 2018, and that it did not consider any other alternatives to foster care. *Id.* at 59.

Parents' contention is without merit. As discussed extensively above, Child was adjudicated dependent and remained dependent throughout the proceedings of this case. Regardless, we address Parents' contention that SPLC is not the least restrictive placement available to Child. Here, the evidence established that Parents were unable to pass a parenting class through Justice Works. Although Parents have been attending counseling, visitation supervisors and caseworkers have not seen any application of parenting skills or the results of said counseling during Parents' visitation. Parents still argue with each other and Paternal Grandmother, resort to physical discipline too quickly, and Mother is still too controlling of Child and dismissive of Father. Child exhibits signs of anxiety before and after visits with Parents, and seems ambivalent about her own placement preferences.

Finally, we note the following observations of the trial court:

Parents have offered to have Mother move out of Paternal Grandmother's home if [Child] is returned. They believe this ameliorates any safety concerns. For the reasons set forth above, we did not and do not view this as a viable option at this time. Parents, individually or collectively, need to make more progress, internalize what they have learned and are learning, and ameliorate, if not completely erase, the conduct that causes [Child] anxiety before return in any context may be considered.

- 24 -

This is especially true given the length of time this case has been open and the stability [Child] has and the progress she is making in her current foster home.

Trial Court Opinion, 12/18/18, at 18-19. We discern no abuse of discretion in the trial court's reasoning or in its conclusion that SPLC is the least restrictive alternative available to Child at this time. *N.A.*, 116 A.3d at 1148; *L.Z.*, 111 A.3d at 1174.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/29/19