J-A27031-25

2026 PA Super 33

| IN THE INTEREST OF: M.K.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 947 EDA 2025 |

Appeal from the Order Entered April 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000061-2025

| IN THE INTEREST OF: M.A.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PHILADELPHIA DEPARTMENT OF HUMAN SERVICES | : | |
| | : | |
| | : | |
| | : | No. 948 EDA 2025 |

Appeal from the Order Entered April 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000062-2025

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

OPINION BY BECK, J.:                    **FILED FEBRUARY 24, 2026**

In these consolidated cases, Philadelphia Department of Human Services ("DHS") appeals from the orders entered by the Philadelphia County Court of Common Pleas ("juvenile court") denying its petitions to involuntarily terminate the parental rights of S.L. ("Mother") to M.K.L. and M.A.L. (together,

"Children"), twins born in January 2021.[1] DHS argues that the juvenile court abused its discretion by determining that DHS failed to prove, by clear and convincing evidence, that Mother's rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8) of the Adoption Act. Because we conclude that the juvenile court misapplied the law when considering whether DHS met its burden under section 2511(a)(8), we vacate the orders and remand for proceedings consistent with this decision.

### Procedural History

On February 19, 2025, twenty-six months after DHS removed Children from Mother's care, DHS filed the instant petitions to involuntarily terminate Mother's parental rights. DHS sought termination under section 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act, which provide as follows:

> **(a) General rule.** --The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his

---

[1] DHS also filed a petition to involuntarily terminate the parental rights of Children's father, V.W. ("Father"). DHS did not proceed with its petition because Father agreed to relinquish his parental rights voluntarily on the day of the hearing. *See* N.T., 3/13/2025, at 5. The certified record does not indicate the status of Father's parental rights. Father has not participated in this appeal.

physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.** --The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b).

Hearings on the petitions occurred on March 13, 2025, conducted by the same juvenile court judge who presided over Children's ongoing dependency matter pursuant to the Juvenile Act.[2] DHS presented the testimony of Sheena Lowe ("Lowe"), a Community Umbrella Agency ("CUA") case manager at NET Community Care assigned to the family by DHS. While Lowe was testifying, DHS admitted—without objection—Children's dependency court dockets, which reflect the juvenile court's orders entered throughout their dependency case. N.T., 3/13/2025, at 10; *see* DHS Exhibit 1. We summarize DHS's evidence to provide context for its arguments.[3]

---

[2] In Philadelphia County, the family court division of the court of common pleas has jurisdiction over termination proceedings. 20 Pa.C.S. §§ 711, 713; *see also* 23 Pa.C.S. § 2301 (court of common pleas has original jurisdiction over involuntary termination matters to be exercised through appropriate division); 42 Pa.C.S. § 6351(i) (same judge who presided over dependency proceedings in family court may be assigned to orphans' court division for purpose of hearing termination proceedings).

[3] We must sua sponte ensure that the juvenile court: (1) complied with its statutory duty to appoint counsel to represent a child's legal interests in contested termination of parental rights proceedings pursuant to 23 Pa.C.S. § 2313(a) and (2) performed the requisite conflict determination prior to appointing a single attorney to represent a child's best and legal interests. *In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020). Children were represented at the hearing by Attorney Lauren Ferguson of the Support Center for Child Advocates, who represented Children as guardian ad litem in their dependency matter. No order of appointment appears in the certified record. The juvenile court interrupted DHS's presentation of evidence to address Children's representation. N.T., 3/13/2025, at 37-38. Attorney Ferguson informed the Court that Children's positions were not ascertainable because they were "essentially non-verbal," and could only articulate simple single words like "dog." *Id.* at 38. The juvenile court announced that it was appointing Attorney Ferguson to represent Children as counsel in the
*(Footnote Continued Next Page)*

**Evidentiary Record**

<u>DHS Exhibit 1: Juvenile Court Orders</u>

According to the shelter order, DHS removed Children in December 2022 pursuant to an order of protective custody. ***See*** DHS Exhibit 1 (Shelter Order, 12/2/2022). Following a shelter care hearing, the juvenile court found that

---

termination proceeding. ***Id.*** Attorney Ferguson argued in support of DHS's petition before the juvenile court and on appeal.

When a child's preferred outcome is not ascertainable, a court may appoint a single attorney to represent the child's best and legal interests. ***In re. T.S.***, 192 A.3d. 1080, 1092 (Pa. 2018). Performing the required conflict determination and appointing counsel after the hearing already began, however, is inconsistent with the procedure described by ***K.M.G. See Matter of Adoption of A.C.M.***, 333 A.3d 704, 709 (Pa. Super. 2025) (emphasizing both the "relative ease" of a juvenile court's duty pursuant to section 2313(a) and its importance due to the "critical rights … at stake") (citation omitted). Nevertheless, because Children were represented at the hearing, we decline to emphasize form over substance in this case. ***See T.S.***, 192 A.3d at 1090 n.19.

Also of note is this Court's request for trial courts and counsel to "prominently" feature information regarding compliance with ***K.M.G.*** in the opinion and briefs on appeal. ***A.C.M.***, 333 A.3d at 709 n.7. To that end, Children note in their brief that Attorney Ferguson served in a dual role without conflict, asserting that "all counsel consented to the Child Advocate serving in this dual role prior to the start of the hearing." Children's Brief at 6 n.3. While we appreciate counsel highlighting the issue, whether all counsel consent to a dual role appointment has no bearing upon section 2313(a) compliance pursuant to ***K.M.G.*** The failure to appoint a separate attorney to represent the child's legal interests constitutes structural error, the issue is non-waivable, and the right belongs to the child, not to other parties. ***K.M.G.***, 240 A.3d at 1235 (citations omitted). Additionally, because it is the juvenile court's duty to appoint counsel for a child pursuant to section 2313(a) as construed by ***K.M.G.***, the juvenile court, not the attorney, "must determine whether counsel can represent the dual interests before appointing an individual to serve as GAL/Counsel for a child." ***Id.*** at 1236.

remaining in Mother's care would be contrary to Children's welfare. *Id.* It transferred temporary physical and legal custody to DHS, allowing DHS to place Children in kinship care with S.K. ("Paternal Grandmother"). *Id.* The court permitted Mother to visit Children at DHS with "line of sight, line of hearing" supervision. *Id.*

Following a hearing on February 21, 2023, the juvenile court adjudicated Children dependent under the Juvenile Act. *Id.* (Adjudication Order, 2/21/2023).[4] The juvenile court transferred legal custody to DHS, noting that Children, who remained in kinship care, were attending early intervention services and were up to date or scheduled for medical and dental appointments. *Id.* The court ordered that visitation continue under the previously ordered restrictive conditions. *Id.* The juvenile court expressly deferred making findings regarding child abuse until a later hearing. *Id.* It found that Mother's home was "not appropriate" and there was no proof of her employment. *Id.* The juvenile court ordered DHS to refer Mother to the Clinical Evaluation Unit ("CEU") for a dual diagnosis assessment to evaluate mental health and substance abuse and for Mother to submit to three random urine screens by the next court date. *Id.* It also ordered DHS to refer Mother

_____

[4] The juvenile court found that the evidence presented by DHS was clear and convincing and substantiated the allegations in the petitions to adjudicate Children dependent, noting that its findings of fact were in the record. DHS Exhibit 1 (Adjudication Order, 2/21/2023). In the termination matter, however, DHS introduced neither the dependency petitions nor a transcript containing the court's findings.

to the Achieving Reunification Center ("ARC") for "parenting, housing, and employment" and to refer her to "family school." *Id.* Finally, the court ordered Mother to complete "anger management." *Id.*

Ultimately, the juvenile court did not rule upon DHS's allegations of child abuse until DHS presented evidence at a December 2024 permanency review and aggravated circumstances hearing several months prior to the termination hearing.[5] Following its consideration of reports by Dr. Michelle Dominguez and DHS Investigator Jacqueline Staggers-Field, as well as photographs of M.K.L., the juvenile court found that Mother was the perpetrator of child abuse pursuant to the Child Abuse Act. *Id.* (Permanency Review Order, 12/18/2024). Because it found that M.K.L. was a "victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated neglect by the parent," the court determined that aggravated circumstances existed regarding Mother. *Id.* (Aggravated Circumstances Order, 12/18/2024). It did not relieve DHS of making reasonable efforts to reunify Children with Mother. *Id.*

_____

[5] *See* 42 Pa.C.S. §§ 6341(c.1) (providing for a hearing to address agency's allegations of aggravated circumstances regarding a dependent child), 6302 (defining aggravated circumstances in relevant part as when the "child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent"). Beyond orders continuing the adjudication hearing twice for further investigation and a post-adjudication order continuing a hearing because DHS's physician witness was unavailable, the record does not explain why a hearing to resolve the allegations did not occur until December 2024. *See id.* (Juvenile Court Orders, 1/4/2023, 2/6/2023, 5/24/2023).

Between the adjudication hearing and aggravated circumstances hearing, the juvenile court monitored the case at five permanency review hearings. *See id.* (Permanency Review Orders, 5/24/2023, 9/20/2023, 2/24/2024, 9/9/2024,[6] 12/18/2024).[7] During that time, the juvenile court found that Children were doing well in Paternal Grandmother's care; receiving early intervention services and occupational, physical, and speech therapy; on a waiting list to be evaluated for autism; and up to date with their medical needs. *Id.* (Permanency Review Orders, 5/24/2023, 9/9/2024). Although the juvenile court continually found that DHS made reasonable efforts towards reunifying Mother and Children, Mother never achieved reunification or progressed beyond weekly contact with Children with line-of-sight and line-of-hearing supervision. *See id.* (Permanency Review Orders, 5/24/2023, 9/20/2023, 2/24/2024, 9/9/2024).

During Children's over two years in kinship care, the juvenile court expressly reiterated its directive four times for Mother to undergo a dual diagnosis assessment, monitoring, and random urine screens and it twice

_____

[6] Curiously, the order indicates that "[n]o evidence [was] presented to the court," despite several specific factual findings in the order. *Id.* (Permanency Review Order, 9/9/2024).

[7] None of these orders include findings by the juvenile court regarding Mother's compliance with services nor her progress in rectifying the issues that brought Children into care. *See* 42 Pa.C.S. § 6351(2), (3); *see also In Int. of C.K.*, 165 A.3d 935, 943 n.8 (Pa. Super. 2017) (observing that the Juvenile Act requires the juvenile court to make both findings at each permanency review hearing).

directed Mother to undergo urine screens "forthwith." ***Id.*** (Permanency Review Orders, 5/24/2023, 9/20/2023, 2/24/2024, 9/9/2024). Several orders indicate that Mother was enrolled in mental health treatment at JFK, with one order clarifying that the treatment did not address substance abuse and another indicating that Mother signed a release of information. ***Id.*** (Permanency Review Orders, 9/20/2023; 2/24/2024, 9/9/2024). The court ordered JFK to provide a treatment plan and progress report several times. ***Id.*** (Permanency Review Orders, 9/20/2023, 2/24/2024, 9/9/2024).

Regarding parenting, Mother completed a court-ordered parenting class in December 2023. ***Id.*** (Permanency Review Order, 2/24/2024). Mother then attended family school twice a week; it went well initially, but the school ultimately discharged her unsuccessfully. ***Id.***

Mother completed court-ordered anger management services in December 2023. ***Id.*** Notably, after she completed anger management, CUA suspended Mother's visits and they moved to DHS. ***Id.*** (Permanency Review Order 9/9/2024). After an initial visit at DHS that went well, Mother became "irate" regarding DHS's provision of snacks to Children at the second visit. ***Id.*** Specifically, she "knocked over the snacks and made a mess," before having to be escorted out. ***Id.*** As a result, visits were suspended at DHS. ***Id.***

Regarding housing, the court ordered CUA to assist Mother with housing referrals in September 2023, found that Mother had "inappropriate" housing in February 2024, and ordered CUA to refer Mother to ARC for housing and for

Mother to obtain and maintain stable housing in September 2024. *Id.* (Permanency Review Orders, 9/20/2023, 2/24/2024, 9/9/2024). As for financial stability, Mother completed a money management class and Mother was employed at a home health agency for a time, but as of the February 2024 hearing, she had not provided DHS with paystubs to verify her employment since September 2023. *See id.* (Permanency Review Orders, 9/20/2023, 2/24/2024). The court ordered Mother to maintain and provide proof of her employment in September 2024. *Id.* (Permanency Review Order, 9/9/2024).

Regarding Mother's cooperation with CUA, Mother did not attend the February 2024 hearing, and the juvenile court ordered her to make her whereabouts known and to provide CUA with an address. *Id.* (Permanency Review Hearing, 2/24/2024). In September 2024, the juvenile court ordered "Mother to avail [sic] to CUA and comply with CUA case planning." *Id.*

In the last permanency review order entered prior to the termination hearing, in addition to the child abuse finding, the Juvenile Court found that DHS made reasonable efforts to finalize Children's permanency plan, maintained the placement goal as reunification with Mother, and ordered Children to remain committed to DHS and placed in kinship care. *Id.* (Permanency Review Order, 12/18/2024).

Lowe's Testimony

Lowe was DHS's only witness to testify at the termination hearing. At the inception of her testimony, Lowe testified that she reviewed the case file, records, and history to familiarize herself with the case history when CUA first assigned her to the case in April 2024. N.T., 3/15/2025, at 9. In response to a question by DHS's solicitor asking whether CUA was "required to keep an electronic case record and document all events that occur at or near the time when those events happened," Lowe responded affirmatively. *Id.* at 9-10.

Through Lowe's review of CUA's records,[8] she learned that DHS removed Children from Mother's care in December 2022 after M.K.L. presented at the emergency room with a black eye and a laceration next to his eye that needed stitches and DHS received a CPS report. *See id.* at 9, 11. Mother's counsel objected to hearsay when Lowe began describing the report, prompting the juvenile court to ask Lowe if she observed the injuries. *Id.* at 11. Lowe responded no, but she reviewed the information documented in CUA's records. *Id.* at 11. The solicitor argued both that Lowe could testify from CUA's

_____

[8] As we discuss in more detail when relevant, Mother's counsel objected multiple times during Lowe's testimony, asserting that Lowe did not have personal knowledge and/or was testifying to hearsay. *See* Pa.Rs.E. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."); 801(c), 802 (prohibiting introduction of an out-of-court statement made by a declarant offered "to prove the truth of the matter asserted in the statement," unless exception applies).

- 11 -

business records as a hearsay exception and that DHS was offering the information to establish why Children came into care, not the veracity.[9] **See id.** at 11-12. In response to the latter argument, Mother's counsel questioned the relevance of the information. **Id.** at 12. DHS's solicitor then requested that the juvenile court take judicial notice that it had founded Mother as a perpetrator of child abuse "at the last listing." **Id.** at 13. The court did so, and Lowe began explaining that there were "old scars" on both Children when Mother's attorney objected again. **Id.** The solicitor reiterated her belief that the business records exception to hearsay applied and argued that DHS did not need to present the testimony of the physician who opined that M.K.L. suffered child abuse as it was a "termination hearing." **Id.** at 14. The court conducted a sidebar off the record. **Id.** When questioning resumed regarding additional reasons why Children came into care, Mother's counsel objected to hearsay and lack of personal knowledge, and DHS's solicitor again invoked the business records exception. **Id.** at 15-16. Without expressly addressing the business records exception argument, the juvenile court permitted Lowe "to testify as to what her understanding was of the issues in this case once she

---

[9] Rule 803(6) of the Pennsylvania Rules of Evidence excepts from hearsay "[a] record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition" if the record meets certain specific conditions, "all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification," and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Pa.R.E. 803(6).

reviewed the file." *Id.* at 16. Lowe responded that DHS had "additional issues concerning [Mother's] home, that it was a lot of clutter, and the home was in a state of disarray and there wasn't any food in the refrigerator and very little food in the cabinets." *Id.*[10] Lowe did not offer any further testimony regarding the inception of the case.

Lowe testified that CUA typically conducts a single case plan ("SCP") meeting at the outset of the case and again at six-month intervals. *Id.* at 23. She responded affirmatively when asked if meetings have been held for this case. *Id.* She was not asked, nor did she offer, the dates of the meetings or if Mother attended. *See id.* Lowe did not recall what SCP objectives CUA established for Mother at the outset of the case. *Id.* at 24-25.[11] She testified that when she took over the case, Mother's SCP objectives were to: (1) comply with CUA, including meeting monthly with Lowe and visiting Children; (2) maintain employment; (3) obtain housing; (4) comply with court orders, which directed Mother's participation in a dual diagnosis assessment and random drug screens; and (5) address mental health concerns. *Id.* at 24.

_____

[10] Mother's counsel objected to the answer as "speculation," but the juvenile court never ruled upon the objection because Mother interrupted Lowe's testimony to interject her own assertion. *Id.* at 17.

[11] Lowe was not asked, nor did she explain, what an SCP objective is or how it relates to the termination matter. Based upon the context, it appears that she is referring to the goals CUA developed based upon the concerns it had regarding the family's safety and the objectives CUA expected the parent to achieve in order for CUA to recommend reunification.

According to Lowe, to facilitate reunification, each month CUA holds a monthly meeting with a parent known as an "SP28 visit." *Id.* at 27. The purposes of the meetings are to share information about the case, provide updates concerning the children to the parent, and review the SCP objectives and the status of the objectives. *Id.* Throughout the eleven months Lowe was assigned to the case, Mother attended the monthly meetings three times, including one held the Monday before the termination hearing and two prior to the filing of the petition. *See id.* at 29. On other occasions, Mother would initially agree to meet, but when Lowe followed up, Mother did not answer her phone, reply to her messages, or appear at the meeting location. *Id.* at 29-30.

Regarding Mother's mental health, over objection by Mother's counsel, Lowe testified that she has concerns about Mother's mental health because she "has some diagnoses" and "there have been times where [Mother] hasn't consistently addressed her mental health." *Id.* at 21. Over another objection by Mother's counsel, Lowe testified that she personally had concerns that Mother was using substances because she sent Mother for nine random drug screens that, according to CEU, Mother failed to complete. *Id.* at 18-20. Mother was last at the CEU in January 2024. *Id.* Lowe notified Mother about the screens through email or text message. *Id.* at 25. CUA referred Mother for a dual diagnosis assessment at CEU, which was also ordered by the juvenile court, but Mother never submitted to the assessment. *Id.* at 22-23.

Mother's only explanation to Lowe regarding her refusal to submit to the assessment and screens was that it was either not a good time or that she attempted to go another time. *Id.* at 25.

Regarding housing, Lowe testified that CUA referred Mother to housing services at DHS and ARC and Mother is "on a number of housing lists," but she does not have housing "appropriate" for reunification. *Id.* at 31. In December 2023, Mother completed services at ARC regarding "parenting, housing, and anger management." *Id.* at 26. Mother initially participated in ARC services for workplace development, financial, and housing services, but she did not complete the services, resulting in ARC's closure of her case on February 28, 2025. *Id.* The record does not clarify why Mother participated in housing services at ARC twice. As for employment, when Mother met with Lowe at the SP28 meeting shortly before the termination hearing, she told Lowe that she was working at a "temp agency" but did not provide Lowe with verification or her paystubs upon Lowe's request. *Id.* at 32-33. Mother reported working at another agency several months ago, and she likewise had not provided verification with her paystubs upon CUA's request at that time. *Id.* at 33-34.

Lowe testified that Mother's visits are currently supervised at DHS and they have never been expanded over the two years Children have been in care. *Id.* at 34. Lowe stated she does not know why Mother's visits were supervised by line of sight and hearing. *Id.* at 46. Mother previously visited

at NET, the CUA agency that employs Lowe, but the visits moved to DHS in March 2024 after Mother told NET's guard that she was using the bathroom but she "came out and loitered around our office and went to some staff's offices" instead. *Id.* at 35. According to Lowe, Mother consistently visits for two hours a week, except for an interlude in December 2024 until the end of January 2025. *Id.* at 35-36. During that time, Mother stopped participating and Lowe was unable to reach Mother. *Id.* at 36. Visits resumed in February 2025, and Mother told Lowe that she had checked herself into "Friends Hospital." *Id.* at 37. DHS did not provide any further information regarding the nature of this hospital admission.

Lowe personally supervised approximately six visits. *Id.* at 36. By her assessment, "[o]verall the visits go generally well. [Mother] usually brings some type of snack or she brings a toy to the visit with her, and she interacts with [Children]. Sometimes they sing nursery rhymes and such together." *Id.* at 37. Mother initiates affection with Children by "go[ing] up to them" and hugging and kissing them. *Id.* at 37. Lowe has not witnessed Children initiating any affection with Mother during her visits. *Id.* at 39-41.

Based upon Lowe's observations of Children's interactions with Paternal Grandmother, she believes that Children have "a close relationship with their grandma. They are happy to see her, like when I bring them back from visits and such. They do jump up on her lap and stuff. They seem really well bonded and comfortable with grandmom." *Id.* at 42. Paternal Grandmother

is willing to adopt Children. *Id.* In Lowe's opinion, Children have a "parent-child relationship" with Paternal Grandmother, that appears to be "healthy," and that she is "safe and loving" towards them. *Id.* at 43. In Lowe's opinion, Children are "closely bonded" with their "Gran Gran," to whom they look to take care of them and to address needs like fear, hurt, and loneliness. *Id.*

Lowe believes that Children would suffer "irreparable harm" if Children were removed from Paternal Grandmother's care, but they would not suffer "irreparable harm" if the court terminated Mother's parental rights. *Id.* at 43. When asked what the basis for her opinion was, Lowe responded that she has observed "a lot of growth" in Children's development; that they need and receive services including speech, physical therapy, and occupational therapy;[12] that Paternal Grandmother is meeting their basic needs such as food, clothing, and providing a "safe, clean, secure home." *Id.* at 44. In contrast, "Mother does not have the proper housing to accommodate them," nor does she "have the proper supports, such as an income, that is needed for the children to be in a safe and secure home." *Id.* The solicitor asked Lowe if it was in Children's "best interest that the goal be changed to

_____

[12] On cross-examination by Children's counsel, Lowe added that Paternal Grandmother set up these services for them. *Id.* at 45.

adoption"—presumably referring to the permanency goal in Children's dependency matter—and Lowe responded, "yes." *Id.*[13]

On cross-examination by Children's counsel regarding what she has observed between Mother and Children at visits, Lowe testified that Mother and Children have a bond that seems "healthy" and Mother's visits have not been cut short.[14] *Id.* at 45-46. Attorney Feguson also questioned whether Lowe had reasons other than Mother's housing and income instability that caused her to believe that Children would not be irreparably harmed if Mother's rights were terminated; Lowe responded, "No." *Id.* at 47.

On cross-examination by Mother's counsel, Lowe responded affirmatively to the question of whether the "original germinating complaint"

---

[13] Although DHS apparently filed a petition to change Children's permanency goal, there is no indication that this was a combined goal change and termination of parental rights hearing. *See* N.T., 3/13/2025, at 5 (solicitor informing the juvenile court that DHS filed petitions to terminate rights and change the permanency goal to adoption, but requesting that the court proceed with the hearing pertaining to the petition to terminate Mother's rights); Juvenile Court Opinion, 5/30/2025, at 1 (describing the hearing as a termination proceeding). Although there is interrelation between the two matters, they remain separate and distinct legally. *See Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021) (noting that termination proceedings are often interrelated to dependency proceedings, but the proceedings remain "distinct" with their own docket numbers and records, and—except for the County of Philadelphia—in different divisions of the court of common pleas); *In re A.L.D.*, 797 A.2d 326, 339–40 (Pa. Super. 2002) (noting that the jurisdiction to address matters in dependency and termination of parental rights are derived from different statutes).

[14] The latter testimony was in direct conflict with the juvenile court's finding in the September 2024 permanency review.

was abuse. *Id.* at 47. Mother's counsel then questioned whether there had been any abuse since Children's removal from her care, and Lowe responded that she has not observed any abuse to Children since she was assigned to the case, pointing out in later testimony that Children have remained in kinship care throughout the case. *Id.* at 48. Lowe agreed with Mother's counsel that if Mother obtained appropriate housing, reunification could be considered. *Id.* at 49.

On redirect examination, Lowe agreed with DHS's counsel that housing was not the only barrier to reunification because Mother has not alleviated concerns regarding substance abuse and mental health. *Id.* at 51. Mother interjected, proclaiming that Lowe "had a mental health letter in her purse" and questioning how mental health could be a barrier "if it's completed." *Id.* On re-redirect examination, the solicitor asked Lowe if the failure to obtain dual diagnosis assessment and undergo screens had been an issue since the beginning of the case. *Id.* at 53. Lowe responded that they were since she had the case. *Id.* The solicitor pressed further, asking her again if the concerns had remained "unalleviated" since even before Lowe was on the case. *Id.* In response, Lowe merely stated that Mother "did obtain housing for a period of time and then she lost that housing." *Id.*

Notably, the transcript reflects that Mother interrupted Lowe's testimony (and the proceedings in general) almost seventy times by interjecting her own answers to questions asked of Lowe; cursing; declaring her opinion of the

proceedings or the testimony; hurling personal insults at Lowe; and generally ranting. The judge or the court officer repeatedly instructed Mother to stop speaking when she was not testifying, to "[s]top screaming out," and to "[c]alm down," but Mother's disruptive behavior persisted. **See id.** at 17-20, 22, 27-28, 29-30, 32, 39-40, 51. When Lowe was explaining why she believed Mother was using substances, the trial court indicated that the sheriffs had to escort Mother out of the courtroom for a period "because [she] had another outburst." **Id.** at 18-20.

### Mother's Testimony

Following the close of DHS's case, Mother testified on her own behalf. N.T., 3/13/2025, at 54-57. Mother asserted that she did not attend a dual diagnosis assessment or treatment because she "did not get the proper referral at first. There was a lot of the issue with the referral, from my understanding, and that's all I know about that." **Id.** at 54. She testified that she had been to the CEU on the "scheduled days" and "given urine." **Id.** Mother indicated that the ARC program director told her she "did not have to complete" ARC's workforce development and housing program because she "already did it." **Id.** Mother claimed that she was never referred to DHS for housing. **Id.** at 54. She receives a paycheck every Friday by the temp agency and she is willing to provide paystubs. **Id.** at 55. Mother acknowledged that housing is a barrier to reunification, but she claims that she "did the best that I could when I had the homecare job. I was paying for a room on the side,

but other than me physically doing it on my own, paying for a room, I haven't gotten a single referral or any help as far as the housing program. And they know I need it right now." *Id.* at 56.

Regarding her visits, Mother insisted that she resumed visiting Children in January 2025, not February as Lowe indicated. *Id.* at 55. Mother described the visits as "good," noting that they sing and she brings snacks, toys, and clothes for Children. *Id.* at 55-56. Mother believes that she and Children "have a bond" and that she is "there for them." *Id.* at 56.

### Denial of Petition and Rationale

The juvenile court immediately denied the termination petitions following the close of evidence. N.T., 3/13/2025, at 59. It then entered orders presumably pertaining to Children's dependency matter, even though it was presiding over a termination of parental rights hearing. *Id.*[15] The juvenile court ordered Children to remain in kinship placement and permitted Mother to visit Children weekly at DHS with line of sight, line of hearing supervision. N.T., 3/13/2025, at 59. It ordered Mother to: (1) go to the CEU for a dual diagnosis evaluation and three random screens; (2) "continue mental health treatment at JFK"; (3) provide proof of employment to CUA; (4) obtain housing; and (5) to attend anger management. *Id.* The juvenile court

_____

[15] DHS does not challenge the juvenile court's authority to enter these orders at the termination hearing. Instead, as we discuss infra, DHS contends they support its argument that the orders contradict the juvenile court's factual findings and conclusions of law in the termination matter.

ordered JFK to provide a treatment plan and progress report prior to the next listing and for CUA to refer Mother to "DHS housing and PHMC housing." *Id.*

Upon DHS's request, the juvenile court provided its rationale on the record. It asserted that DHS did not present "any evidence … as to [Mother's] mental health or her … compliance therein." *Id.* at 59. It described "no CEU since 1/24" as a "thing[] working against mom," presumably referencing the evidence establishing that Mother did not present to the CEU for a dual diagnosis evaluation or drug screen despite being ordered to do so since the outset of the case. *Id.* The court then described the evidence it "heard": that Mother attended "every visit," "completed parenting, housing, and anger management," and "started workforce, finance, and housing." *Id.* at 60. It "heard that the main barriers to reunification are housing and income," then said it "heard the barriers to reunification are no CEU, no mental health, and no housing." *Id.* Further, it "heard" that Mother's visits with Children "go well," with Mother bringing "snacks or toys" and Children "sing[ing] together," and Mother and Children have a "healthy bond." *Id.* The juvenile court stated that although DHS's argument in support of termination was compelling, the testimony did not match the argument. *Id.* at 66. The juvenile court was troubled by the lack of "specifics as to [M]other's shortcomings," preventing it from "clearly and convincingly" deciding that Mother's rights should be terminated, as well as evidence regarding Mother and Children's healthy strong bond. *Id.* at 66-67.

The juvenile court elaborated further in its Rule 1925 opinion, concluding that DHS failed to meet its burden of proving "Mother's inability to remedy the conditions that brought the Children into care." Juvenile Court Opinion, 5/30/2025, at 4. It stated that DHS "presented the testimony of a single witness with limited familiarity with the Children and Mother" and the "record and testimony … failed to demonstrate Mother's ongoing inability to provide care for or control of the Children by clear and convincing evidence." *Id.*

Noting that Lowe reviewed CUA's file prior to testifying, the court found that her testimony established that Children "were removed from Mother's care in December of 2022 due to a physical abuse allegation and other concerns regarding the home." Juvenile Court Opinion, 3/30/2025, at 4-5 (citing N.T., 3/13/2025, at 8-11). It observed Lowe's testimony regarding Mother's SCP objectives—including that she did not recall what they were at the outset—and stated that "DHS's failure to call a witness with familiarity of the parts of this case that preceded Ms. Lowe's involvement, and Ms. Lowe's lack of knowledge in this area, raised questions that caused the [juvenile c]ourt concern." *Id.* at 5. The juvenile court found that Lowe's testimony "proved that Mother had been moderately compliant with her SCP objectives," highlighting Mother's completion of a "parenting class, housing class, and anger management therapy," as well as her attendance at "some of her SCP meetings" and consistent visits with Children. The juvenile court found that

Lowe "was unable to rebut Mother's claim that she is employed at a temporary employment agency." *Id.* It acknowledged Mother's failure to "provide random urinalysis as ordered" and found that "she clearly lacks suitable housing." *Id.* While testimony supported a finding that Mother was on "housing lists," DHS "never explained … what exactly this means or if DHS or other agencies were actively assisting Mother achieve this important objective." *Id.*

From Lowe's testimony, the juvenile court inferred that Mother's visits with Children were "appropriate and positive experiences for everyone," highlighting that Mother brings snack and toys, Mother and Children sang nursery rhymes together, and Mother "initiated affection with Children by kissing and hugging them in an appropriate manner." *Id.* at 5-6. The court determined that Mother's interactions with Children were proper and appropriate, emphasizing the absence of "testimony elicited that showed that Lowe or any other CUA visitation personnel ever had to redirect or coach mother during her time with the Children," as well as Lowe's testimony "that Mother and Children enjoy a healthy bond." *Id.* at 6. The juvenile court expressly discussed the needs and welfare evidence supporting DHS's case, citing Lowe's testimony that Children share a close relationship and bond with their current caregiver, as well as the caregiver's provision of a "safe, loving, healthy relationship" and that she ensures "Children attend the services they need." *Id.* It recognized Lowe's opinion that Children would "suffer harm" if

they were removed from Paternal Grandmother as well as her belief that they would not suffer "irreparable harm" if the court terminated Mother's parental rights. *Id.* Nevertheless, the court found

> Lowe's advocacy for the termination of Mother's parental rights seemed to hinge on the fact that Mother currently lacks suitable housing and is financially insecure. N.T., 3/13/2025, at 44. On cross-examination, Lowe admitted that this was the case. She stated that money and housing were the reasons that she believed [Children] would not be irreparably harmed and that if Mother had housing, reunification could be considered. *Id.* at 47-49. This court does not take the prospect of terminating a someone's [sic] parental rights lightly and DHS's burden in these matters is a significant one. DHS elected to present the testimony of one witness who has limited exposure to this case and to its participants. Rather than document a list of the evidence that DHS failed to present either because of indifference or the lack of its existence, the court will focus on what was in fact presented. This case became known to authorities due to an allegation of abuse. There are no other allegations of abuse concerning these Children, or Mother, before or after the filing of this case. Mother has visited with Children consistently. There is no evidence that she ever appeared high, drunk, or even late to any visits or that the visits were anything other than appropriate. Mother completed some, but not all[, of] her SCP objectives. This court does not fill out a scorecard when deciding whether to grant or deny a petition to terminate parental rights, but rather accords each factor the appropriate weight that it deserves in the process. The breadth of information the court considers in deciding these matters is limited to the evidence that the parties present. In this case, the party bearing the burden, DHS, elected to present a case deficient in both quality and quantity, and this court cannot terminate one's parental rights on a record so devoid of real evidence. DHS failed to meet its burden of proof, making it unclear to this court whether termination of mother's parental rights were in the child's best interests.

*Id.* at 4-7 (cleaned up).

In its comments on the record, written order denying the petition, and Rule 1925 opinion, the juvenile court did not expressly articulate whether its

denial was based upon grounds, needs and welfare, or both. *Id.* at 59-60. Its written order denying the petition indicated that "[s]uch disposition having been determined to be best suited to the protection and physical, mental and moral welfare of the child," *see* Juvenile Court Order, 3/13/2025, at 1, but its Pa.R.A.P. 1925 opinion indicated a more ambiguous or equivocal conclusion: "DHS failed to meet its burden of proof, making it unclear to this court whether termination of mother's parental rights were in the child's best interests." *See* Juvenile Court Opinion, 5/30/2025, at 7.

### Issues on Appeal

DHS filed the instant appeal, raising five issues for our review:[16]

[1]. Did the juvenile court commit reversible error by admitting testimony regarding earlier events in the case and then refusing to consider that evidence for lack of personal knowledge in denying the petitions?

[2]. Did the juvenile court commit reversible error by failing to perform the required bifurcated analysis under 23 Pa.C.S. § 2511(a) and (b)?

[3]. Did the juvenile court abuse its discretion in denying the petitions where the material factual findings supporting the denial are not supported by competent evidence?

[4]. Did the juvenile court abuse its discretion and commit an error of law in denying the petitions to terminate parental rights where competent evidence clearly and convincingly established each of the four grounds pled for termination under 23 Pa.C.S. § 2511(a)?

[5]. Did the juvenile court abuse its discretion and commit an error of law in denying the petitions to terminate parental rights where

---

[16] Both DHS and the trial court complied with Rule of Appellate Procedure 1925.

competent evidence clearly and convincingly established that it is in the children's best interests to terminate Mother's parental rights and the juvenile court failed to consider Children's bonds with their pre-adoptive kinship provider?

DHS Brief at 5-6 (name designations altered; issues reordered for ease of disposition).

**Standard and Scope of Review and Legal Framework**

In reviewing a juvenile court's denial of an agency's petitions to terminate a parent's rights involuntarily, we adhere to the following standard:

In cases concerning the involuntary termination of parental rights appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the [juvenile] court if they are supported by the record, but it does not require the appellate court to accept the [juvenile] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the [juvenile] court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will.

*In re Adoption of G.W.*, 342 A.3d 68, 83-84 (Pa. Super. 2025) (en banc) (quoting *In re Adoption of C.M.*, 255 A.3d 343, 358-59 (Pa. 2021)). In our review, we are cognizant that terminating a parent's rights to a child "is among the most powerful legal remedies that the judicial system possesses." *Id.* at 84 (quoting *Interest of S.K.L.R.*, 256 A.3d 1108, 1129 (Pa. 2021)). "Because [juvenile] courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is

paramount that, in reviewing [juvenile] courts' decisions in this arena, appellate courts defer to [juvenile] courts' first-hand observations as they relate to factual determinations." ***Id.***

The Adoption Act requires a bifurcated process when considering a petition to terminate an individual's parental rights. ***Id.*** at 82-83. "Courts must begin by first considering whether a parent's conduct warrants termination under section 2511(a) prior to shifting its focus to whether termination best serves the child's needs and welfare." ***Id.*** at 83. The petitioner only needs to prove one of the eleven distinct grounds under subsection (a) to shift the focus to section 2511(b), which then requires the court to determine whether termination serves the child's developmental, physical, and emotional needs and welfare. ***In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (en banc). The party seeking termination must prove the elements of section 2511 by clear and convincing evidence, which is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Matter of Adoption of L.C.J.W.***, 311 A.3d 41, 48-49 (Pa. Super. 2024) (citation omitted). This Court may affirm the juvenile court's decision to terminate parental rights pursuant to any one subsection of section 2511(a), as well as subsection (b). ***In re J.F.M.***, 71 A.3d 989, 992 (Pa. Super. 2013).

As for evidentiary issues in termination of parental rights hearings, the "decision of whether to admit or exclude evidence is within the sound discretion of the [juvenile] court," and this Court "will not disturb these rulings absent an abuse of discretion." *In re A.J.R.-H.*, 188 A.3d 1157, 1166–67 (Pa. 2018). Nevertheless, if a juvenile court admits evidence that is not competent over the objection of the other party, the objecting party raises the issue on appeal, and this Court decides that the evidentiary error has any impact upon the order, this Court must vacate and remand for a new hearing. *Id.*

**Issue 1: Failure to Consider Evidence Admitted at the Hearing**

DHS first argues that the juvenile court erred by sua sponte refusing to consider Lowe's testimony to events outside her personal knowledge that it admitted at the hearing pursuant to the business records exception to the rule against hearsay. DHS's Brief at 22-30. DHS asserts that the juvenile court's retroactive exclusion of evidence undermined due process. *Id.* at 22-24. It likens the situation to one in which this Court granted a new criminal trial based upon the trial court's erroneous and prejudicial sua sponte mid-trial reversal of a pretrial ruling that breathalyzer test results were inadmissible after defense counsel had detrimentally relied on this ruling in his opening statement. *Id.* (citing *Commonwealth v. Metzer*, 634 A.2d 228, 235-36 (Pa. Super. 1993)). From DHS's perspective, the only history of the case Lowe did not know was "why the court [had] ordered line-of-sight and line-of-

hearing supervision," and the dependency docket indicated that the juvenile court ordered this restriction at the shelter hearing upon removal and maintained it throughout the case. *Id.* at 21 n.1. It contends that it met the prerequisites for the business record exception to hearsay and emphasizes its essential need to rely upon such an exception, citing staff turnover, its role in assuming custody of and overseeing the care of children for several years, and its statutory duty to present information to the juvenile court regularly. *See* DHS's Brief at 24-27.

Neither the record nor the juvenile court's opinion supports DHS's contention. First, despite DHS's emphasis on its critical need to rely upon the business record exception to the exclusion of hearsay evidence, the witness DHS elected to present at the termination hearing rarely appeared to rely upon any information DHS may have maintained in its record at the hearing. For example, when asked by the solicitor on the second round of redirect examination about whether Mother's issues with housing, dual diagnosis, and random screens have remained "issues from the beginning," Lowe expressly confined her response to the year that she had been on the case instead of responding based upon information in DHS's case file. N.T., 3/13/2025, at 53. She repeatedly disclaimed any knowledge of information that would have been contained in the record, including Mother's SCP objectives at the time of Children's adjudication of dependency and why line-of-sight visits were ordered. *See id.* at 24-25, 46.

Second, nothing in the juvenile court's rationale suggests that it refused to consider any of Lowe's testimony. To the contrary, the juvenile court found that the "record and testimony" DHS presented failed to meet its burden. Juvenile Court Opinion, 5/30/2025, at 4. In so holding, it expressly relied upon the testimony Lowe provided—in particular, her emphasis upon Mother's lack of "proper housing to accommodate [Children]" and "proper supports, such as income" as the only reasons why Mother cannot provide "a safe and secure home" to Children, as well as her acquiescence that the agency could consider reunification if Mother obtained appropriate housing—despite clear contrary evidence contained in both the historical and current dependency orders entered by the juvenile court. *See id.* at 6 (citing N.T., 3/13/2025, at 44, 47-49). In the juvenile court's opinion, DHS's case was "deficient in both quality and quantity" because it elected to present only "the testimony of a single witness with limited familiarity with the Children and Mother." *See id.* at 4, 7. In an apparent recognition that Lowe's testimony did not comport with the documented history of the case, the juvenile court lamented Lowe's "lack of knowledge" concerning "the parts of this case that preceded [her] involvement … [which] raised questions that caused the [juvenile c]ourt concern." *Id.* at 5. In other words, the juvenile court **did** consider Lowe's testimony and concluded that it did not clearly and convincingly persuade the court to terminate Mother's parental rights.

In contrast to DHS's argument that the juvenile court "improperly nullified admissible evidence after the close of evidence and entry of judgment," **see** DHS's Brief at 30, we conclude instead that the juvenile court considered the evidence and concluded that DHS did not meet its burden of proving that it should terminate Mother's parental rights. As the underlying basis of DHS's argument that the juvenile court nullified evidence after admitting it fails, no relief is due to DHS regarding its first issue.[17]

## Issue 2: Failure to Conduct Statutory Legal Analysis

Next, DHS argues that the juvenile court erred by failing to conduct the bifurcated legal analysis required by section 2511(a) and (b). DHS's Brief at 30-32. Specifically, DHS contends that the juvenile court erred by not analyzing the evidence under any subsection of 2511(a) before "summarily concluded that the record was 'devoid of real evidence.'" **Id.** at 32.

_____

[17] Although we need not and do not decide today whether DHS satisfied the requirements of the business record exception, we caution the agency that in contrast to the specific information offered in cases discussing the satisfaction of the exception, DHS's method of establishing the presumption of trustworthiness in its records merely consisted of several leading questions by the solicitor seeking affirmative responses from Lowe. **See** N.T., 3/13/2025, at 9-10; **compare, e.g., Bayview Loan Servicing LLC v. Wicker**, 206 A.3d 474, 482-83 (Pa. 2019). Furthermore, although not precedential, this Court has reasoned that neither Rule 803(6) nor the Uniform Business Records as Evidence Act "permits a witness to testify as to the contents of a record that is not present, or being offered for admission, merely because he or she purports to have read that record at an unspecified time in the past," and explained that a witness' interpretation of what a record said lacks the same indicia of reliability as a written original or duplicate document entered into the evidentiary record pursuant to the business records exception. **In re T.B.**, 266 A.3d 609, **7-8 (Pa. Super. 2021) (non-precedential decision).

DHS is correct that the juvenile court's legal analysis appears to have ignored the distinct subsections of section 2511(a) and considered grounds, or possibly grounds along with needs and welfare, en masse instead. As stated above, before the juvenile court analyzes whether termination of parental rights serves a child's welfare pursuant to section 2511(b), the bifurcated statutory analysis requires the court to first analyze whether the petitioner proved one or more of the grounds alleged in its petition under subsection (a). *C.M.*, 255 A.3d at 359. Section 2511(a) "provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *Id.*; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). These grounds "are not interchangeable," and "our Supreme Court has emphasized time and again that we must hew closely to the statutory language" in analyzing matters under the Adoption Act. *G.W.*, 342 A.3d at 85-86 (citing *Int. of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023); *In re Adoption of S.P.*, 47 A.3d 817, 827-28 (Pa. 2012)).

As a practical matter, this means that the court cannot deny the petition under subsection (a) or skip ahead to consider subsection (b) until it analyzes and rejects each subsection of (a) alleged in the petition. When appellate courts review a juvenile court's legal analysis, we do not look for the recital of "magic words" in its opinion, but we cannot affirm if the trial court did not "make clear" that it considered the pertinent legal factors and applied the

correct legal standard in weighing them. ***See Int of K.T.***, 296 A.3d at 1114-15.

Nothing in the juvenile court's opinion indicates that it analyzed the petition under each subsection of (a) pled by DHS before denying the petition. In fact, although the juvenile court cites a case discussing the bifurcated process, its conclusion asserts that DHS's failure to meet its burden of proof made it "unclear to this court whether termination of mother's parental rights were in the child's best interests," suggesting that the juvenile court may have erroneously moved directly to subsection (b) without considering whether termination was warranted under subsection (a). ***See*** Juvenile Court Opinion, 3/15/2025, at 3-4, 7. In its comments on the record and in its written opinion, the juvenile court never cites to the individual subsections of (a), discusses the elements of any subsection, or cites to pertinent case law applying any subsection.

This oversight appears to have been based upon the court's frustration with DHS's evidentiary presentation. However, just as the juvenile court could not disregard the statutory framework to grant a petition based upon its overall impression of the petitioner's evidence, a parent's general lack of efforts or progress, or its sense that terminating a parent's rights is best for the child, a juvenile court also cannot deny the petition based upon its general dissatisfaction with DHS's evidentiary presentation. While the juvenile court is free to ultimately conclude that DHS did not meet its burden based upon

the evidence that it introduced, the court must only arrive at that conclusion **after** analyzing the evidence DHS presented pursuant to **each** statutory subsection pled by DHS. *See G.W.*, 342 A.3d at 85-86. In other words, the court does not merely consider whether the petitioner clearly and convincingly proved its petition; instead, it considers whether the petitioner proved by clear and convincing evidence each statutory element pled. *See In re T.R.*, 465 A.2d 642, 644 (Pa. 1983) ("[I]n all proceedings to involuntarily terminate parental rights … the petitioner must prove the **statutory criteria** for that termination by at least clear and convincing evidence.") (emphasis added); *see also C.M.*, 255 A.3d at 362 ("[S]uch a significant final decree warrants the courts' closest consideration of whether competent evidence clearly and convincingly proves **the precise elements of the grounds at issue**, in a manner 'so clear, direct, weighty and convincing' it betrays no hesitance regarding the truth of the facts in issue.").

To be clear, we share the juvenile court's frustration with DHS's evidentiary presentation. As the juvenile court aptly observed at the conclusion of the hearing, DHS's argument did not wholly match the evidence it presented—a problem that persists on appeal. In fact, this was a problem from the outset of the filing of the termination petitions: there is a significant mismatch between the detailed facts it averred in its petition to terminate Mother's parental rights and the facts DHS even attempted to prove at the hearing. To meet its burden, DHS does not need to relitigate every aspect of

the dependency case, but it cannot simply rely upon the fact that a child has been in DHS care for fifteen of the last twenty-two months at the time of the filing of the petition. No matter what occurred in a child's dependency case, an agency-petitioner must provide sufficient and competent evidence **in the termination matter** to support its case. ***In re Quick***, 559 A.2d 42, 47 (Pa. Super. 1989).

It is not difficult to understand why the juvenile court found the testimony of DHS's sole witness to lack persuasiveness. She often failed to provide details to support her testimony, did not focus on areas upon which the juvenile court logically needed to hear evidence, and frequently failed to connect the dots to assist the factfinder in understanding the bases for termination. DHS's sole witness did not know what Mother's SCP objectives were at the inception of the case or why the court ordered supervision of visits with restrictive line-of-sight and line-of-hearing supervision—the very restrictions relied upon by DHS to demonstrate that Mother was incapable of parenting outside of these confined parameters.

The juvenile court correctly identified both the seriousness of terminating parental rights and that DHS bears the burden of introducing competent evidence that clearly and convincingly supports its petition. ***See C.M.***, 255 A.3d at 358 (recognizing that termination has "far-reaching and intentionally irreversible consequences for the parents and the child" and involves potentially competing rights between a parent's fundamental and

intrinsic interest in parenting their child and the child's essential needs for a parent's care, protection, and support); **A.J.R.-H.**, 188 A.3d at 1171 (holding that the gravity of decree requires the decision to be based solely on competent evidence); **S.K.L.R.**, 256 A.3d at 1126 (explaining that any petitioner seeking "state's most extreme and permanent measure of interfering" with parental rights "must prove by clear and convincing evidence that termination of a parent's rights is warranted pursuant to 23 Pa.C.S. § 2511"). As this Court en banc emphasized in **G.W.**, an agency needs to provide a "clear presentation of evidence that is derived from firsthand sources (to the extent possible) and that is tightly focused on the precise statutory elements at hand." **Id.** at 95. The clear and convincing evidentiary standard is not simply best practice; it is a standard derived to protect the constitutional rights of the family. **See Santosky v. Kramer**, 455 U.S. 745, 766-70 (1982); **T.R.**, 465 A.2d at 643-44.

However, as discussed above, Lowe's testimony was not the only evidence presented by DHS. The juvenile court offers no indication that it considered its own judicial findings in the dependency case introduced into evidence through DHS Exhibit 1 without objection. It referred in general to the insufficiency of the "record and testimony," **see** Juvenile Court Opinion, 3/13/2025, at 4, but its analysis repeatedly discusses Lowe's testimony without mentioning any information in DHS Exhibit 1. Even if it was not persuaded in whole or in part by Lowe's testimony, before denying the

petition, the juvenile court was required to analyze the distinct subsections based upon all evidence offered by DHS.

As we have recounted, the juvenile court's decision carries with it grave consequences, and this is the precise reason that the court must "make clear" that it considered the pertinent legal factors and applied the correct legal standard in weighing them before concluding that DHS failed to meet its evidentiary burden. **See Int. of K.T.**, 296 A.3d at 1114-15. It also drives the policy behind the statutory scheme that directs, when possible, the same judge who presided over the dependency proceedings to decide the termination matter. **See Quick**, 559 A.2d at 47. Unlike a parent-initiated termination, an agency-initiated case regarding a dependent child involves a parent who has "already demonstrated an inability to provide proper basic care" and whom "the trial court often has observed … through multiple hearings over the course of several months or years." **C.M.**, 255 A.3d at 369-70. As this Court has explained when rejecting a parent's challenge to the same judge presiding over both cases, "[n]o one is in a better position to determine whether the parties have fulfilled their mutual responsibilities toward these goals than the [j]uvenile [c]ourt [j]udge who was involved with the child from the beginning." **Quick,** 559 A.2d at 47. While the "basis for the termination decision … must stand on its own evidence and be established by clear and convincing evidence," assigning the same judge "will assure the record is full and complete so that termination will not be granted if the agency

is overreaching, or **termination won't be denied because of a pro forma presentation**." **Id.** (emphasis added).

In sum, a juvenile court must evaluate all evidence presented by a petitioner to consider whether such evidence proves each statutory element of the subsections of 2511(a) pled by clear and convincing evidence. **See T.R.**, 465 A.2d at 644. The court may proceed to section 2511(b) only after it determines that the petitioner's evidence proves all elements of at least one subsection of 2511(a). **In re K.R.**, 200 A.3d at 979. If the court finds the petitioner failed to prove any element of a particular subsection of 2511(a), it must separately analyze the elements of the other subsections pled before denying the petition. **See G.W.**, 342 A.3d at 83–84. In either event, the court's analysis must "make clear" that it applied the proper legal framework. **See Int. of K.T.**, 296 A.3d at 1114-15. The juvenile court in the case at bar erred by failing to do so.

### Issues 3 and 4: Denial of Petition Pursuant to Section 2511(a)(8)

We discuss DHS's next two issues together as they are interrelated. DHS argues that the juvenile court abused its discretion in denying the petitions because DHS presented clear and convincing evidence to meet its burden. DHS's Brief at 37-45. Specifically, DHS argues, inter alia, that under (a)(8), it proved that "Mother failed to address the core issues that led to the children's removal, including her untreated mental health conditions, substance abuse, and chronic inability to manage anger, as demonstrated in

part by her "volatile behavior during the termination hearing." *Id.* at 45. DHS contends that the juvenile court's material factual findings in support of denial are not supported by competent testimony in the record and undercut by its order at the end of the hearing. *Id.* at 33-37, 35 n.7. DHS insists that "a trial court's factual findings must rest on competent, corroborated testimony rather than unverified claims." *Id.* at 33 (citing *C.M.*, 255 A.3d at 369-70). It also argues that complying with some SCP objectives does not demonstrate that Mother resolved "the root problems" and any findings to the contrary are belied by its order at the end of the hearing. *Id.* at 35 & n.7.

To terminate parental rights under section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S. § 2511(a)(8); *In re C.L.G.*, 956 A.2d 999, 1008-9 (Pa. Super. 2008) (en banc). In contrast to certain other provisions of section 2511(a), the court's focus under subsection (a)(8) is not whether the parent has tried to change throughout the child's time in care or is capable of changing in the future. *G.W.*, 342 A.3d at 87. Rather, the second prong of subsection (a)(8) requires the court only to discern if the parent has, in fact, remedied the conditions that led to the child's removal or placement. *Id.* To that end, the relevant inquiry under the second prong of subsection (a)(8) is "whether reunification of parent and child is imminent at

the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009). Further, "the court shall not consider any efforts by the parent to remedy the conditions described [in section 2511(a)(8)] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. § 2511(b).

In the instant case, Children have been removed from Mother's care for over two years—twice as long as the period contemplated by the first prong. Turning to the second prong, the analysis centers on whether DHS proved that the conditions that led to the removal or placement of Children continued to exist. Although the juvenile court did not expressly analyze section 2511(a)(8), it appears to have found, based upon Lowe's testimony, that DHS removed Children "due to a physical abuse allegation and other concerns regarding the home." Juvenile Court Opinion, 3/13/2025, at 4-5 (citing N.T., 3/13/2025, at 8-11); ***see also id.*** at 7 ("This case became known to authorities due to an allegation of abuse."). To the extent that the juvenile court intended it as such, the record does not support the finding that the child abuse was a mere allegation or that these two conditions were the only ones leading to Children's removal and placement. Although DHS did not present its case cohesively or in much detail, it did introduce evidence that: (1) M.K.L. received stitches after appearing at the emergency room with a laceration next to his eye and a black eye, ***see*** N.T., 3/13/2025, at 13; and (2) in Children's dependency matter, the juvenile court: (a) found that Mother

was the perpetrator of child abuse and aggravated circumstances existed, *see* DHS Exhibit 1 (Permanency Review and Aggravated Circumstances Order, 12/18/2024); (b) restricted Mother's contact with Children to visits under "line of sight, line of hearing" supervision at the shelter hearing and never lifted the restriction, *see generally id.*; and (c) found, at the time of Children's adjudication, that Mother needed to address concerns related to housing, employment, drug and alcohol treatment, mental health treatment, parenting, and anger management, *see id.* (Adjudication Order, 2/21/2023). Thus, the record shows that the conditions that led to Children's removal and placement were Mother's infliction of child abuse, lack of appropriate housing, lack of employment, parenting, drug or alcohol use, mental health, and ability to control her anger.

As for whether these conditions continue to exist, nothing in the opinion indicates that the juvenile court analyzed the facts it had before it to make this determination or that it applied the correct legal construct to do so. The juvenile court only found that DHS failed to meet its burden of proving "Mother's **inability to remedy** the conditions that brought the Children into care." Juvenile Court Opinion, 5/30/2025, at 4 (emphasis added). But it did not find that Mother **had, in fact, remedied** the conditions that brought Children into care, such that reunification of Children with Mother was imminent. *G.W.*, 342 A.3d at 87. The court is correct that it does not need to "fill out a scorecard" to make this evaluation, *see* Juvenile Court Opinion,

3/13/2025, at 7, but it does need to apply the correct statutory standard to evaluate the evidence.  **See G.W.**, 342 A.3d at 87.

As it pertains to the conditions that led to Children's removal, the juvenile court made the following relevant findings:

(1) *Child abuse*: Mother did not abuse children during her contact with them, which was at weekly visits under line-of-sight and line-of-hearing supervision.

(2) *Employment*: Mother was employed at a temporary agency at the time of the hearing.

(3) *Housing*: Mother completed a class and is on housing lists.  She lacks suitable housing.

(4) *Substance abuse*: Mother did not submit to court ordered random urinalysis.  She did not appear to be under the influence at the weekly visits.

(5) *Mental health*: No findings made because of a lack of evidence presented.

(6) *Anger management*: Mother completed the service regarding anger management to which CUA referred her.[18]

(7) *Parenting*: Mother completed a class.  She visited consistently.  During her weekly highly supervised visits, she acted appropriately and without need for redirection.

**See** Juvenile Court Opinion, 5/30/2025, at 4-7.

Contrary to DHS's arguments, these findings have support in the record.

For example, DHS's protestations notwithstanding, **see** DHS's Brief at 32, 36,

---

[18]   The juvenile court found that Mother completed "anger management therapy," but the record does not indicate any details whether the "anger management" services Mother completed was indeed therapy, a class teaching a parent general anger management skills, or something else.

Lowe's own testimony supports the juvenile court's determination that Mother visited Children consistently, she interacted with Children properly, and the visits were positive for all involved. In response to the solicitor's query about the general nature of the visits, Lowe testified (based upon her knowledge of the case and her observation of approximately six visits) that "[o]verall the visits go generally well," and described positive interactions between Mother and Children. *See* N.T., 3/13/2025, at 37. Mother visited in a largely consistent fashion for almost two years under close supervision, yet Lowe described only two concerns about the visits: once Mother claimed to use the bathroom but "loitered around [NET's] office" instead; another time Mother failed to remain in contact and stopped visiting in December 2024 and January 2025. *See id.* at 35-37. DHS presented neither the testimony of other visit supervisors nor evidence of other concerns. As such, based upon Lowe's testimony and the absence of evidence regarding concerns or the need for parenting redirection, it was reasonable for the juvenile court to infer that Mother's visits went well and displayed her ability to parent appropriately. The caveat is, of course, that Mother demonstrated this only in a highly supervised setting for two hours a week.

The case relied upon by DHS to poke holes in the factual support for the juvenile court's findings is inapposite. In *C.M.*, the parent testified credibly that she wanted her father to adopt her children because she believed she had a fatal medical condition. *See C.M.*, 255 A.2d at 369. After explaining why

specificity and corroboration are crucial in a private termination case between two parents offering only their own subjective testimony, the Supreme Court determined that this evidence, while credible, was not competent to establish that the prognosis of her rare, relatively unknown health condition, which had not interfered with her parenting to date, was fatal. *See id.* at 369-70. Without corroborating evidence offered by the petitioner-mother, who bore the burden of proof in the termination case she filed against the other parent, our Supreme Court held that the orphans' court abused its discretion by using such evidence to conclude that Mother proved that the circumstances were "unusual" and children's best interests warranted severance of the children's father's rights. *Id.*

In contrast, in the instant case, Mother was not the petitioner in a private parent versus parent case, she did not bear the burden of proof, and her testimony that she was currently employed was competent, if believed, to establish that she was in fact employed. While this Court or another factfinder may have been more skeptical of Mother's claim because of repeated findings that she failed to verify her employment throughout Children's dependency case, it is not an abuse of discretion for the juvenile court to find that Mother was employed based upon her testimony. Again, however, this factual finding only holds so much weight based upon the testimony—that Mother was employed at a temporary agency at the time of the termination hearing, without any details about dates, hours, and wages, is hardly dispositive of any

ultimate issue in this case. The juvenile court's point seems to be more that it is DHS who carries the burden of proof; if the agency wants to rely upon a parent's failure to obtain or maintain employment as a basis for termination, or to discredit a parent's testimony about something within her personal knowledge, it needs to offer evidence to support its claim and how it relates to the question of her ability to maintain her parental rights.

DHS argues that the juvenile court determined that "Mother's finances and housing were the primary barriers to reunification" and that such conclusion "lacks support from competent evidence." DHS's Brief at 34, 35-36 n.7. We disagree that the juvenile court made this specific finding. Instead, the juvenile court was summarizing the evidence DHS presented to support its termination petitions. At the conclusion of the hearing, the court stated that it "heard that the main barriers to reunification are housing and income." N.T., 3/13/2025, at 60. In its opinion, it observed that Lowe's "advocacy for the termination of Mother's parental rights seemed to hinge on the fact that Mother currently lacks suitable housing and is financially insecure," citing to Lowe's explanation for why Children would not be irreparably harmed if the court granted termination. Juvenile Court Opinion, 5/30/2025, at 6 (citing N.T., 3/13/2025, at 44, 47-49).

In other words, the court recounted DHS's own witness testimony that the court should terminate Mother's parental rights because Mother does not have stable housing or income. The juvenile court did not pull this out of thin

air. When asked why she believed terminating Mother's parental rights would not cause Children irreparable harm, Lowe responded with the ways in which Paternal Grandmother was meeting their needs and enhancing their growth, but regarding Mother, Lowe said only that she lacked "proper housing to accommodate" Children and did not have "proper supports, such as income, that is needed for the children to be in a safe and secure home." N.T., 3/13/2025, at 44. Children's counsel provided Lowe another opportunity to expand upon her answer as to other reasons Children would not be irreparably harmed by terminating Mother's parental rights, but Lowe responded that there was no other reason. *Id.* at 46-47. Lowe also agreed on cross-examination that if Mother obtained appropriate housing, DHS could consider reunification. *Id.* at 49. It was not until DHS's solicitor posed a leading question on redirect that Lowe agreed Mother's substance abuse and mental health were also barriers to reunification. *Id.* at 51. Even then, when the solicitor asked if Mother's "issues" with housing, substance abuse, and mental health "have remained unalleviated" over the two years the case had been open, Lowe focused her answer only on housing. *See id.* at 53.

It is easy to understand why Lowe's answers concerned the juvenile court. Subsection (b) prohibits terminating parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S. § 2511(b). DHS's evidence did not fully explain why Mother lacked

housing, what Mother did or did not do to obtain housing, and why her current housing was not appropriate for Children. Likewise, it presented evidence only that Mother was not consistently employed; it did not explain whether her lack of income was within her control. Lowe's testimony downplayed the most serious potential safety concerns in the dependency matter: Mother's initial abuse of one of the children, as well as her anger management, mental health, and substance abuse concerns. Common sense dictates that the dependency court would not maintain intense supervision restrictions of a parent with her children for two years because that parent has unstable housing and income.

Thus, lack of support in the record is not our concern with juvenile court's findings; it is, as DHS alternatively recognizes, that these findings do not establish that the conditions that led to Children's removal no longer exist. Applied to the correct legal standard under subsection (a)(8), the juvenile court's findings, at best, indicate that Mother has made some progress toward eliminating the conditions.[19] However, "[t]he law is clear that a finding that

_____

[19] Although Lowe's testimony failed to expressly link the SCP objectives to conditions leading to removal, the SCP objectives she testified to are largely consistent with the directives ordered by the court at the adjudication hearing. *Compare* N.T., 3/13/2025, at 24-25 (testifying that CUA set objectives related to cooperation with CUA, visitation, employment, housing, substance abuse, and mental health), *with* DHS Exhibit 1 (Adjudication Order, 2/21/2023) (issuing orders concerning visitation, employment, housing, substance abuse, mental health, parenting, and anger management). In its Rule 1925 opinion, the juvenile court expressly found that "Lowe's testimony proved that Mother had been moderately compliant with her SCP objectives" and that "Mother completed some, but not all her SCP objectives." *Id.* at 7.

a parent 'was making progress toward remedying the conditions,' is legally insufficient to preclude termination under (a)(8)." ***G.W.***, 342 A.3d at 88 (citation omitted). We therefore agree with DHS that the juvenile court erred by applying an incorrect legal standard to analyze (a)(8).

We further agree that the juvenile court abused its discretion in applying its factual findings to the incorrect legal standard to conclude that DHS failed to meet its burden. To the extent the juvenile court's assertion that the "record and testimony … failed to demonstrate Mother's ongoing inability to provide care for or control of the Children by clear and convincing evidence" suggests that it analyzed the case under section 2511(a)(8) and decided that the conditions that led to Children's removal no longer existed, ***see*** Juvenile Court Opinion, 5/30/2025, at 4, this conclusion is belied by the court's orders entered at the conclusion of the termination hearing. Therein, the juvenile court ordered Mother to complete directives related to drug and alcohol use, mental health, anger management, employment, housing, and parenting. N.T., 3/13/2025, at 59. It did not increase the frequency of Mother's visitation or lessen the restrictive supervision. ***Id.*** These orders strongly suggest that reunification was not imminent and that the juvenile court believed that Mother had not remedied the conditions that led to Children's removal. In fact, the orders entered at the termination hearing essentially mirror the orders entered at the adjudication hearing two years prior.

- 49 -

We therefore conclude that although there is some support in the record for most of the court's factual findings, the juvenile court erred as a matter of law by not applying the correct legal standard under subsection (a)(8). We recognize that DHS's evidentiary presentation complicated the juvenile court's ability to assess whether DHS clearly and convincingly proved the second element of (a)(8), but its failure to consider all the evidence presented by DHS in reaching its decision—including its own orders—constituted an abuse of discretion. *See Int. of K.T.*, 296 A.3d at 1114-15, *G.W.*, 342 A.3d at 83–84.

**Issue 5: Needs and Welfare**

In its final issue, DHS argues that, in addition to prematurely addressing whether termination best serves Children's needs and welfare, the juvenile court applied the wrong standard to make this assessment because the court did not consider Children's bond with Paternal Grandmother and found that Mother and Children had a "parental bond" as opposed to a fun relative relationship at visits. *Id.* at 47-48. DHS contends that it proved through Lowe's "unrebutted testimony" that "terminating Mother's parental rights would not result in irreparable harm" and that terminating Mother's rights served Children's needs and welfare because it protects their relationship with Paternal Grandmother and ability to continue flourishing developmentally and emotionally. *Id.* at 50.

Furthermore, DHS argues that the juvenile court's finding that Children share a healthy bond with Mother is not supported by competent evidence.

DHS's Brief at 34.  In making this argument, DHS criticizes the testimony of its own witness, arguing that Lowe's characterization of the bond as one that seemed healthy was not supported by any substantive evidence.  *Id.*  DHS's argument rests heavily upon the testimony it elicited indicating that Mother initiated affection toward Children but Children "never initiated affection in return," despite evidence it says demonstrates that Children initiate affection with Paternal Grandmother.  *Id.* at 35.  It also criticizes the juvenile court for "interpret[ing]" Lowe's testimony as an indication that the visits are "appropriate and positive experiences for everyone." *Id.* at 47.

The third prong of section 2511(a)(8) requires a determination of whether "termination of parental rights would best serve the needs and welfare of the child."  23 Pa.C.S. § 2511(a)(8).  Unlike the second prong of (a)(8), which focuses on the behavior of the parent, the third prong of section 2511(a)(8) specifically "accounts for the needs of the child." *C.L.G.*, 956 A.2d at 1008-09.  Likewise, section 2511(b) requires courts to consider whether termination of parental rights serves a child's needs and welfare from each child's perspective, placing the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *Int. of K.T.*, 296 A.3d at 1105-06.  Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare

of the particular children involved." ***In re T.S.M.***, 71 A.3d 251, 268-69 (Pa. 2013).

When determining whether the petitioner met its burden to prove that termination best serves a child's needs and welfare, the juvenile court must consider, at a minimum, the factors delineated by our Supreme Court in ***K.T.***, all of which are of "'primary' importance in the [s]ection 2511(b) analysis" and "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare." ***Int. of K.T.***, 296 A.3d at 1109.

The juvenile court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." ***Id.*** If a bond exists, the court must ascertain the effect upon the child of severing the bond. ***Id.*** Because the severing of any parent-child bond may be emotionally painful for a child, the juvenile court cannot preclude termination based solely on evidence of an "adverse" or "detrimental" impact to the child or truncate its analysis at this finding. ***Id.*** at 1110-11. Instead, focusing upon the "child's development, and mental and emotional health," the juvenile court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. ***Id.***

The parent-child bond, however, is "but one part of the overall subsection (b) analysis." *Id.* The court must also consider:

the child's need for permanency and length of time in foster care consistent with [the Juvenile Act,] 42 Pa.C.S. § 6351(f)(9) and [ASFA], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.*

When conducting "a full subsection (b) analysis focused upon the child," the juvenile court has "discretion to place appropriate weight on each factor present in the record." *Id.* at 1113. However, when "weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *T.S.M.,* 71 A.3d at 269. The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *Int. of K.T.*, 296 A.3d at 1105.

As we explained in our discussion of issue two, it appears that the juvenile court may have jumped to the needs and welfare portion of the analysis prior to evaluating each ground for termination. To do so was legal error. *G.W.*, 342 A.3d at 83. The juvenile court should only proceed to a needs and welfare analysis under the third prong of (a)(8) and (b) if it concluded that DHS proved the first two prongs of (a)(8). As stated above, the juvenile court's decision as to the first two prongs was in error.

**Remedy**

The remedy for these errors is not simply reversing the juvenile court's order denying termination, as DHS suggests. To resolve the petition in DHS's favor in this case on this record would require this Court to make factual findings that the juvenile court did not make and to weigh evidence and competing considerations. These actions are counter to our standard of review. ***See S.K.L.R.***, 256 A.3d at 1129; ***cf. G.W.***, 342 A.3d at 88 (applying juvenile court's factual findings regarding grounds to the correct legal standard because such findings had full support in the record and weighing of evidence by this Court was not required). Instead, we are compelled to remand the matter so that the juvenile court may apply the correct legal standard applicable to subsection (a)(8) and to use its discretion to reach a conclusion. In doing so, the court must evaluate all evidence presented by DHS, including the juvenile court's findings introduced in DHS Exhibit 1. Given "termination's irreversible effect on a child's relationship with a parent," on remand "we allow the trial court an opportunity to review the record or further develop it," if needed, to conduct the correct section 2511(a)(8) analysis. ***See Int. of K.T.***, 296 A.3d at 1117.

We are not directing the juvenile court to resolve any issues regarding DHS's burden in a particular fashion or to weigh the facts in a particular manner, other than abiding by the statutory framework required by the General Assembly. We make several observations, however, to guide its

analysis. First, the court should bear in mind that although applying subsection (a)(8) to a parent who has made some progress toward resolving the problems that led to removal of her children may seem harsh,

> by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*R.J.S.*, 901 A.2d at 513.

Second, given that Children came into care as a result of Mother's perpetration of child abuse upon M.K.L., the repeated orders for Mother to address anger management beginning at the outset of the case and continuing through the date of the termination hearing, and Mother's visits for twenty-seven months restricted to weekly to line of sight and line of hearing supervision, it is of utmost importance that the court carefully assess whether DHS has proved that Mother's anger management issues continue to exist. In particular, while Lowe testified that visits went well, the juvenile court also was presented with, but did not address, its own factual findings during Children's dependency case indicating that Mother's visits were suspended at both CUA and DHS during the duration of this case. Particularly pertinent is its findings following the September 9, 2024 permanency review hearing that

Mother's visits at DHS were suspended because she became "irate," knocked over snacks, and made a mess, leading to her being escorted out. The factual findings in the September 9, 2024 permanency review order suggest that Mother's anger management issues persisted at that time, possibly in the presence of Children.

We also emphasize that at the conclusion of the termination hearing, the court ordered Mother to participate in anger management services, despite finding that she already completed anger management services. Although we cannot reach a definitive conclusion at this stage of the case, this suggests that the court has in fact determined that the condition continues to exist and that Mother needs further work in that area. Indeed, whether this condition has been remedied is highly questionable based upon Mother's behavior at the hearing. Termination of parental rights hearings are extremely emotional, and a parent's ability to control their behavior during such a hearing may not be reflective of their general behavior in the rest of their life. Nevertheless, based upon our review of the cold record and our extensive experience reviewing these matters, Mother's behavior and inability to control her outbursts seventy separate times was atypical conduct in a termination proceeding and, to put it gently, highly concerning. Given that Children were removed from Mother's care, in part, because of Mother's infliction of child abuse upon M.K.L., we find it odd that the juvenile court did not even make mention in its opinion of her conduct during the hearing, and manifestly

unreasonable for it to make no finding as to whether or not it evidenced a continuing concern related to her anger management and/or mental health. This is particularly true here, as the juvenile court that heard the evidence firsthand and observed Mother's behavior during the hearing is familiar with the parties and has observed Mother in other proceedings related to Children.

Turning to the needs and welfare analysis, if the juvenile court reaches the third prong of subsection (a)(8) and subsection (b), it must analyze the evidence on remand in accordance with *K.T.* We offer the following observations to guide the court's analysis. First, we recognize the disconnect between DHS's argument that Lowe's testimony is not competent to prove that the bond between Children and Mother is healthy and positive, yet is somehow competent to prove that Children will experience no irreparable harm if Mother's rights are terminated. Clearly, this is not an assessment that we can make on appeal. A healthy bond, however, is not the ending point of the analysis: the court must consider whether the bond "is necessary and beneficial to the child" and weigh the consideration with other factors present in the record. *Int. of K.T.*, 296 A.3d at 1114-15. It must also determine each child's needs and consider the bond (both with Mother and Paternal

Grandmother) from the child's perspective and within the context of the child's developmental, physical, and emotional needs and welfare. *Id.*[20]

## Conclusion

Orders vacated. Case remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

Judge Murray joins the Opinion.

Judge Bowes files a Concurring Opinion.

_____

[20] We appreciate the concern so thoughtfully set forth by our concurring jurist that remanding a dependency-related termination of parental rights case detracts from the goal of securing finality and permanency for young children during the fleeting stage of their youth. Our Supreme Court has emphasized, and we remain cognizant of, the critical nature of children's permanency needs and the impact of the failure to be vigilant about obtaining it promptly. *See In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013). At the same time, our High Court has "acknowledged the solemn reality that a decree terminating parental rights is widely regarded as the civil law equivalent to the death penalty, forever obliterating the fundamental legal relationships between parent and child." *In re Adoption of C.M.*, 255 A.3d 343, 362 (Pa. 2021). The stakes are high and "intentionally irreversible." *Id.* at 358. While the Concurrence is correct that we afford a much lesser deference in cases involving dependency adjudications, permanency goal changes, and custody decisions, all of which profoundly impact a child's life, only termination decisions are irrevocable. The bifurcated statutory scheme, DHS's exacting burden of proof, and our standard of review on appeal all reflect the nature of these stakes and competing interests of the parties. "[O]ur role is not to decide whether [the petitioner] satisfied its burden of proof at the hearing; instead, we must decide whether the orphans' court abused its discretion or erred as a matter of law in deciding that [the petitioner] did not." *G.W.*, 342 A.3d at 94. We certainly appreciate the learned Concurrence's view that the facts reveal only one reasonable outcome and plainly support the termination of parental rights, *see* Concurring Opinion at 2, 4, but it is not our role to make this determination in the first instance.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/24/2026